STATE *v.* J. G. HOLLY.

(Filed 31 May, 1911.)

1. **Homicide — Poisoning — Evidence, Expert — Hypothetical Questions—Scope—Analysis for Poison—Prejudicial Error.**

Upon a trial for a homicide alleged to have been brought about by means of strychnine, the evidence disclosed that this poison may be in the stomach and death ensue from other causes, and that the quantity contained in the stomach, unassimilated, does not contribute to death; that an analysis had been made of the stomach of the deceased, and an insufficient quantity of strychnine was found to produce death, and that no analysis had been made of the liver or lungs. There was evidence that the deceased may have met his death from other causes; and *held*, reversible error in the trial judge to ask an expert witness a hypothetical question and admitting in evidence an affirmative answer, based upon strychnine having been found in the liver and lungs.

2. Homicide — Poison — Evidence — Character Witnesses — Cross-examination—Collateral Matters.

Upon a trial for a homicide, when the prisoner does not take the stand as a witness, and the indictment has charged him with the killing of the deceased by means of poison, it was competent for the prisoner to introduce witnesses as to his .good character, but reversible error to permit a question as to the witness having heard that the prisoner had been accused of killing his wife, with the reply, "Not till after the present charge was brought."

3. Same.

It is competent upon cross-examination of· the prisoner's witness to ask questions tending to impeach his general character; but a question permitted to be asked as to a particular matter, as to his previously having been accused of killing his wife, would tend to involve numerous collateral issues to the prejudice of the prisoner, and hence constituted reversible error.

4. Witnesses—General Character—Impeaching Questions—Confined as to Time.

. When the prisoner accused of a crime is being tried therefor, and he has not become a witness in his own defense, evidence tending to impeach his general character should be confined to the time preceding the crime charged.

5. Witnesses — General Character — Impeachment—Collateral Matters—Evidence Confined—Instructions.

It is permissible to test the character of a witness by inquiring as to the sources of his information; and he may be asked if there was not a general reputation, prior to the controversy, as to particular matters, tending to his discredit; but such evidence should be restricted by the judge in his charge to the jury to the credibility of the witness who testifies as to character.

APPEAL from *Peebles, J.,* at the January Term, 1911, of NEW HANOVER.

The defendant was convicted of murder in the first degree at the February Term, 1911, of New Hanover Superior Court. He was sentenced to be electrocuted, and appeals to this Court. The .defendant offered no evidence. That introduced on the part of the State tends to show:

That the defendant, J. C. Holly, was the proprietor of a hotel in the city of Wilmington, known as the Rock Spring

Hotel. That the deceased, Edward Cromwell, was a boy about 18 years of age who lived with the defendant, and the defendant spoke of adopting him. It does not appear what relation, if any, the deceased bore to the defendant. That about 27 March, 1910, the Life Insurance Company of Virginia received an application for a $1,000 policy on the life of Edward Cromwell, but declined to issue same for lack of information as to the parentage of the young man. The agent of the Virginia Company told Holly and Cromwell that they might get a policy with the Greensboro Life, and also told the agent of the Greensboro Life that he might get an application from these people. That about 20 June, 1910, application was made to the Greensboro Life Insurance Company for a $5,000 policy on the life of Edward Cromwell. The company issued a $2,500 policy, the beneficiary named being the estate of Edward Cromwell, and the policy was delivered to Holly and Cromwell jointly, Holly paying the premium. That about a week after the policy was delivered Holly and Cromwell requested the agent of the Greensboro Life to make out the papers for the transfer of the policy to Holly, and the transfer was duly made, and probated on the evening of 8 August. That Holly said he intended to adopt the young man and educate him and will him all his property, and that he expected the boy to take care of him in his old age. That the agent said to Holly that the transfer would have to be sent to the home office and be approved before the assignment would be valid, and that Holly, so far as the agent of the Greensboro Life knew, had never been notified that the policy had been transferred to him by the home office. That Holly had insured his furniture for $1,250, stating to the insurance agent at the time the policy was issued that the furniture was worth $1,700. That the agent of the company made an examination after the fire, and valued the furniture at $450. That something was said to Holly about there not being much furniture in the house, and Holly said he had shipped a part of it away. That in June, 1910, the defendant Holly bought one dram of strychnine from a drug store in Wilmington, saying that he wanted it for the purpose of killing rats, and on 3 August, 1910, he bought another dram for the same alleged

purpose. That on the night of 9 August, 1910, the boy Cromwell came into the hotel about 10 o'clock eating an ice-cream cone. That some time after 10 o'clock, one Matthews, the occupant of room No. 8 in the hotel, heard some one who seemed to be in great agony. Room No. 4, where deceased was found, was about 6 feet from room No. 8, occupied by Mr. Matthews. That Matthews heard a low voice like some one crying to another, and then heard a little whiffling sound which he recognized as a peculiar noise made by Holly with his nose. That after the fire witness asked Holly what all the trouble meant in the house that night, and Holly said he was having one of his spells and his boy was fanning him. That on the same night, that is, about 2:30 A. M., on the morning of 10 August, an alarm of fire was turned in, and Holly's hotel was found· to be on fire.

W. P. Monroe, assistant chief of the fire department, testifies as follows: "I am assistant chief of the fire department of the city of Wilmington. On the morning of 10 August, 1910, we had an alarm of fire from box 25, and upon responding to the alarm we found the fire in the old Rock Spring Hotel, occupied by the prisoner, at No. 8 Chestnut Street. I heard people hollering and ordered the men to rescue the people from the windows, which they did. I went in the building from the front, and when I came out the prisoner asked me if I had seen his boy, the one that worked in the kitchen; and I asked him where he was, and he said he usually occupied room No. 4, on the right side of the passage. I went back in the building and found the boy lying in the room No. 4, dead. His head was to the south, his feet to the north, and he was lying on an old comfort, which was burned up, except the part which was underneath him. I went back to the street and told Holly that the man was dead in No. 4, and that if he had told me in time, I could have gotten him out. When I told him the boy was dead, he cried. I examined the room and found that there was a bed, bedstead, mattress, and a grip in the room. The head of the bed was towards the north and the body was lying between the bed and the door, with his feet towards the north. The body was near the foot of the bed. There was nothing on

the bed except the sheet and pillow, and the bed did not look like it had been occupied. Mr. Farrow, Mr. Frost, and myself took the body out. It was then stiff and cold. I discovered the body somewhere between thirty and forty minutes after I got to the fire. The fire was then out. The body was stiff, with hands drawn upon the breast clenched. He had the thumb placed between the two fingers (turned under the forefinger). He appeared to be about 18 years old, and would weigh about 110 pounds, and was about 4 feet and 6 inches tall. The main fire was in the adjoining room, and the partition between this room and room No. 4, where the boy was, had burned out. The mattress which I found in this room was saturated with kerosene on it, and it had burned up to where the boy's body was on it. I detected odors something like kerosene. The fire was burning very badly in the adjoining room. It seemed to have originated there. After I took the body out, I placed it in the front room until the coroner was notified. I did not see the coroner. The body was taken to King's undertaking shop. I asked the prisoner about his furniture, and he said he had shipped some that belonged to Mr. Flowers in Pikeville. Didn't say when he shipped it. There didn't seem to be very much furniture in the house. When I opened room No. 4 it was full of smoke and steam. Chief Schnibben was there at that time. The windows were shut down, and we broke the glass out. The body was dressed in socks and underwear. I saw two kerosene oil cans in the room where the fire originated, and an empty vinegar barrel."

An autopsy was held and a part of the liver, a part of the lungs, and the stomach were sent to W. A. Withers, professor of chemistry in the College of A. and M. Arts, who analyzed parts of the stomach and found two-fifths of a grain of strychnine in the stomach.

Five tests were made, and all of these disclosed the presence of strychnine in the stomach. Professor Withers and the doctors testified that one-half of a grain of strychnine is the minimum dose that will produce death, but that the strychnine which kills is the portion assimilated and distributed through the blood, and not the portion that remains in the stomach, and that he made no test of the liver and lungs.

The court put the following hypothetical question to Dr. Russell Bellamy:

Dr. Russell Bellamy, a witness for the State, testified as follows:

"I am a physician. (Witness is admitted by the defendant to be an expert.) I have heard the evidence in this case and am acquainted with the effect of poison on the human system."

Q. By the Court: If the jury should find that the deceased was a young man about 18 years old, weight from 110 to 140 pounds, was found dead between 2 and 3 o'clock in the morning, stiff and rigid, with his hands clenched and his thumbs between his forefingers, and upon chemical examination of the contents of his stomach and a part of his liver and a part of his lungs, the jury should find that such chemical examination showed that those parts had about two-fifths of a grain of strychnine in them; what, in your opinion, would be the cause of the death of the deceased? A. Strychnine or the salt of strychnine.

Dr. Bell, a witness for the State, testified upon cross-examination that the general character of the defendant was good. Upon the redirect examination the witness was asked by the State if he had not heard that the prisoner had been accused of killing his wife. The witness answered: "Not until after the present charge was brought." To this question and answer the defendant objected and excepted.

Two expert witnesses on the part of the State expressed the opinion that the cause of the death of the deceased was suffocation by smoke.

The evidence was entirely circumstantial.

*Attorney-General Bickett and Assistant Attorney-General G. L. Jones for the State.*

*C. D. Weeks and William J. Bellamy for defendant.*

ALLEN, J., after stating the case. We have examined the record with the care the importance of the case demands, and conclude that there is error which entitles the prisoner to a new trial.

STATE *v.* HOLLY.

The hypothetical question propounded by the court to the medical expert, Dr. Russell Bellamy, included an important circumstance, as to which there was no evidence, to wit, that there had been a chemical examination of a part of the liver and a part of the lungs of the deceased, and that strychnine was found in each. Professor Withers, who made the chemical examination, stated expressly that he made no test of the liver and lungs, and that his test was confined to the stomach. The clear inference from the evidence is that, but for the incorporation of this circumstance into the question, the answer of the expert would have been different, and the prisoner would have had the benefit of an opinion favorable to him, instead of the disadvantage of one that was injurious.

The evidence indicates that strychnine may be in the stomach and death ensue from other causes, and that the quantity found in the stomach does not contribute to death, as it has not been assimilated. It is the strychnine taken up by the system which is dangerous, and this is traced in the liver, lungs and other organs. The materiality of the answer to the question and its effect on the jury is apparent when it is remembered that the cause of the death of the deceased was in dispute, the State contending it was caused by strychnine administered by the prisoner, and the prisoner contending it was from suffocation by smoke, and that two expert witnesses for the State testified the latter was the cause of death.

The injurious effect of this evidence is intensified by the fact that the question was propounded by the court and not by counsel. It not only elicited an opinion upon facts not in evidence, but the jury might well infer that the court thought there was evidence that strychnine had been found in the liver and lungs.

It is not necessary in the statement of a hypothetical question that all the facts should be stated. Opinions may be asked for upon different combinations of facts on the examination in chief and on the cross-examination, but "to allow on the direct examination, an hypothetical question to be put, which assumes a state of facts not warranted by the testimony, is error, and counsel will never be permitted, on the direct examination, to

embrace in an hypothetical question anything which the testimony does not either prove or tend to prove." Rogers Ex. Ev., sec. 27; *People v. Hall,* 48 Mich., 489; *Reber v. Herring,* 115 Pa. St., 609.

We also think there was error in allowing the State to ask Dr. Bell, who testified to the good character of the prisoner, if he had not heard that the prisoner had been accused of killing his wife, and his reply, "Not until after the present charge was brought."

The defendant did not testify in his own behalf, but he was entitled to introduce evidence of his good character, as a circumstance tending to show the improbability of his having committed the crime alleged against him. *S. v. Laxton,* 76 N. C., 216; *S. v. Hice,* 117 N. C., 783. When he avails himself of 'this right, the State can introduce evidence of bad character, but cannot, by cross-examination or otherwise, offer evidence as to particular acts of misconduct.

The rule is just, and based upon sound reason.

A party charged with crime may be prepared to defend an attack upon his general character, which is a single fact, but he could not have at the trial witnesses to explain the conduct of a lifetime.

Again questions of this character, if permitted, would tend to multiply issues, would needlessly prolong trials, and would be calculated to distract the minds of jurors from the real issue.

If a witness may state that he has heard that the defendant had been charged with killing his wife, the defendant ought to be allowed, in reply, to show that the charge is false, and to do so might involve the examination of many witnesses.

If one collateral question of this character can be raised and tried, the same rule would permit a hundred others.

The authorities in this State are numerous and uniform that it is error to allow such questions on the cross-examination of a witness as to character.

In *Barton v. Morphes,* 13 N. C., 520, it was held inadmissible to ask "if he had not heard Morton accused of stealing a penknife"; in *Luther v. Skeen,* 53 N. C., 357, that "there was a

current report in the neighborhood that plaintiff had sworn to lies while living in Randolph"; in *S. v. Bullard,* 100 N. C., 487, "Do you not know that it was extensively talked about and said that the defendant practiced a fraud upon the firm of Worth & Worth?"; in *Marcom v. Adams,* 122 N. C., 222, "Have you not heard that defendant had committed forgery?", "Do you not know the defendant had been indicted for forgery?"; and in *Coxe v. Singleton,* 139 N. C., 362, "Have you not heard that the defendant committed rape on a negro girl?", "Have you not heard he padded his pay-roll at the mill?"

The first of these cases, *Barton v. Morphes, supra,* which has been frequently approved, is of special importance, in that *Chief Justice Henderson* considers the ground frequently urged as a reason for admitting questions like the one under consideration, as a means of testing the character witness. He says: "The ground on which the counsel for the defendant placed the question cannot render the evidence admissible, namely, that although not evidence in chief, it is admissible to impeach the character of the supporting witness; that witness having given the first a good character, when he knew such reports had been circulated, this would be doing that indirectly which the law forbids to be done directly, viz., impeaching the character of the witness in chief by specific charges; and that, too, not by common reputation, but by a mere report, which is very different. For the law supposes the latter to be true, and therefore admits it as evidence. But it makes no such supposition in favor of a mere report, which we know to be most commonly false. Reports may ripen into common reputation and common belief. When they arrive at that stage, it is supposed that they are true. They have been the best test of their truth, *common opinion* and *belief,* and cease to be mere reports."

There is another objection to the answer of the witness, as applied to the facts of this case, and that is that the evidence related to a fact affecting the character of the defendant subsequent to the time of the commission of the offense alleged against him.

When the defendant is not a witness, evidence of his general character should be confined to the time preceding the crime

charged. *S. v. Johnson,* 60 N. C., 151. The rule is otherwise if he testifies in his own behalf, as his credibility is then involved. *S. v. Spurling,* 118 N. C., 1250.

That the evidence was prejudicial cannot be doubted. The prisoner was charged with murdering, by poison, a member of his household, and the evidence was circumstantial. It was calculated to excite feeling against him in the minds of the most intelligent and upright jurors to know that he had been charged with killing his wife.

It is permissible to test the character witness by inquiring as to his sources of information *(S. v. Perkins,* 66 N. C., 126), and he may be asked if there was not a general reputation, prior to the controversy, as to particular matters, tending to discredit; but when this is done the jury should be instructed that such evidence can only be considered as bearing on the evidence of the witness who testifies as to character. ·The evidence was withdrawn from the jury, and the error in admitting it was not cured in the charge.

The competency of the record of the druggist, as the evidence is now presented, is doubtful, but it is not necessary to pass upon it, as the State can produce the witness who made the entries at the next trial. There must be a

New trial.