STATE v. ANDREW ROBERTSON and CEPH. FOSTER.

(Filed 6 May, 1914.)

1. Witnesses — Trials—Impeachment—Specific Acts—Admissions—Contradictions.

A female witness, a married woman, testified upon the trial for homicide, in behalf of the defendants. She was shown a letter signed in her name, which she admitted to have written to a man, soliciting his visits, in the absence of her husband, for the purpose of improper .relations. She then testified that if she had written the letter, it was for another woman. *Held,* that while the answer of a witness to questions asked concerning collateral matters for the purpose of impeaching his testimony is conclusive, and no specific act may be inquired into on cross-examination, it was competent to contradict the statement made by this witness with the contents of the letter she admittedly had written.

2. Homicide—Deadly Weapon—Mutual Fight—Aider and Abettor—Manslaughter.

Where a homicide with a deadly weapon is shown, and there is evidence that the defendant gave the weapon, a pistol in this case, to his codefendant, who committed the homicide, and incited him to do it, in the fight which ensued between him and the deceased, the evidence· tends to show that the prisoner was the principal offender, and is sufficient to sustain a verdict of manslaughter, at least.

3. Homicide—Defense of Home—Justification—Trials—Evidence—Declarations.

The principle that a man may, under certain circumstances, have the right to kill another in defense of his home, does not apply where it is shown that the prisoner, if he was not the aggressor, fought willingly and fiercely, and inflicted the wound when the deceased, who had been visiting his home in a friendly way, was retreating, and declaring he had no intention of hurting any one, and the prisoner's life or limb not being in jeopardy, and the declarations of the prisoner made immediately preced- ing the homicide and while committing it are competent as evidence against him.

4. Homicide—Self-defense—Mutual Fight—Willingness.

Where upon the trial for a homicide there is evidence that the prisoners entered into the fight, which resulted in the death' of the deceased, willingly, and fought fiercely and aggressively, and

the deceased took no advantage of them, it is not error for the judge to instruct the jury that the plea of self-defense was not available if they should find the facts to be as thus testified.

5. Homicide — Deadly Weapon—Malice—Presumptions—Burden of Proof—Appeal and Error—Trials—Instructions.

   Malice will be presumed from the killing of a human being with a deadly weapon, a pistol, rendering the offense, nothing else appearing, murder in the second degree at least, with the burden of proof on the prisoner to show matters of justification, excuse, or mitigation; and where the instructions given by the court thereon are correctly but generally stated, the failure to give more full or exact instructions will not be held as error in the absence of special prayers therefor, aptly and at the proper time requested.

6. Trials—Instructions—Appeal and Error—Record.

   The charge of the court must be construed as a whole, and assignments of error thereon, not supported by the record, will be disregarded on appeal.

APPEAL by defendant from *Webb, J.,* at September Term, 1913, of POLK.

The prisoners were indicted in the court below for the murder of Milton Patterson. The evidence tends to show that Grover Wilkerson, Milton Patterson (the deceased), Dean Bolan, and Will Harris went to the house of Jim Foster, where the homicide occurred, and there found Mrs. Minnie Foster and Andrew Robertson and Cephas Foster (the prisoners), Tom Israel, and Fairy Foster. The following extract from the testimony of the State's witness, Grover Wilkerson, will be sufficient for an understanding of the assignments of error:

"All four went into the room. As witness went in the door, he said 'Hello!' Andrew Robertson said, 'Hello!' and Mrs. Foster said, 'Come in.' Witness walked in and turned to the right. Milton Patterson came in and walked to about the center of the room. Tom Israel and Fairy Foster were sitting on the far side of the room. Milton said to Tom, 'How is Spartanburg?' Tom said, 'All right.' This time Mrs. Foster got up and handed her chair to Will Harris. Will took the chair and sat down close to the bed, where witness was standing. Ceph. Foster was sitting in the corner, and he said to Dean Bolan, 'Come over and

sit down on the trunk with me.' Bolan went over and took the seat. Mrs. Minnie Foster got up and went out of the room on the front porch. Milton Patterson got up and went after her. Andrew Robertson got up and went out. Milton and Mrs. Foster spoke a word or two on the porch. Mrs. Foster turned and came back through the hallway and met Robertson in the hallway. Milton Patterson had just turned from about the front door and met Mr. Robertson. Robertson walked up to him and said, 'What sort of a damned man are you?' and further said, 'You must think you are a God damned bear.' Milton said, 'No; but I am a God damned man.' Robertson said, 'I am a God damned man, too,' and raised his arm like he meant to strike. Milton knocked his arm up and said, 'You have got me to show,' and started backward with Robertson. They were in the hall. Witness was standing in the door that goes into the room. They started coming toward witness, and witness stepped out. Andrew Robertson hollered, 'Shoot him, Tom' (referring to Tom Israel), and he also said to Ceph. Foster, at the same time, 'Kill him, God damn him.' Milton shoved him down on the floor near the dresser. Ceph. Foster ran up with his pistol in his hand and said, 'Must I shoot the God damned son of a bitch?' Witness was standing in the door, and said to Ceph., 'Don't shoot.' Went across and took hold of the pistol. Witness and Ceph. scuffled across to the other side of the house. Dean Bolan got up and took hold of Ceph. Said, 'We can stop this without any shooting or hurting anybody.' Ceph said, 'Stop it, by God, right now.' Witness said, 'I will stop Milton if you will put the pistol up and give it to Dean Bolan.' Ceph said he would. 'I don't want to hurt him. I have got nothing against him, but take him off of Robertson.' Witness said, 'I will if you will not shoot.' He said, 'I will give the pistol to Mr. Bolan.' Mr. Bolan took hold of his hand and said, 'Go take Milton off Robertson.' Milton was down on Robertson, had his knife in his hand, holding it over him. Witness pulled Milton's arm up and said, 'I would not cut him.' He said, 'I won't, if you say not.' He shut his knife up, took it in his hand and hit Robertson over the head two or three or four times with it shut. At that time witness heard Dean Bolan and Ceph scuffling, looked

around, and Ceph was coming toward them with a pistol. Witness stepped around and took hold of him. He kept coming on. Dean Bolan had hold of an arm, and Will came up behind him and took hold of him around the waist. He kept getting nearer Milton with the pistol. Milton hollered to take the pistol away from that boy, that he had no harm for him, and didn't want to hurt him. Ceph got down right over him with the pistol; had both hands on it. Patterson was sitting on Robertson, had his head turned toward witness and the others, looking up. Ceph got near to him, and Milton said, 'Don't get near me.' Milton raised up and hit Robertson with the knife and Robertson ran out the door. Patterson turned like he was going out of the door, turned his head and looked back, and Ceph Foster fired the pistol and shot. Milton threw his hands up and said, 'Don't shoot again; you have killed me already.' Ceph said, 'I will kill you,' and he fired three more shots. Milton was on the floor when he shot. Ceph hit him every time. Hit him in the back the first time. The shot came out up here (indicating). The next shot hit him in the left arm, broke the arm all to pieces. Witness and Dean Bolan had turned him loose. Will Harris turned him loose when the pistol went to snapping. Ceph Foster threw his pistol down, threw the shells down to the trunk in the hallway, and commenced looking through the trunk. Witness and Dean Bolan went to where he was. Robertson was gone. As soon as he got loose from Patterson, he left. Witness said to Ceph, 'What are you doing? You have killed one man.' He said, 'I don't care if I have. I hope, God damn him, I have.' He laid the pistol down and walked to the kitchen. Witness went back to Milton and asked him how bad he was hurt. He said, 'I am shot all over and am going to die.' Said to go after Tom, his brother. 'I am going to die.' Witness went after him, and when he came back, Andrew Robertson was back. There were some other folks there at that time. Patterson died that day. Robertson said he wished he had never seen a pistol, and wished he had never let Ceph Foster have my pistol."

The evidence is voluminous. The prisoners relied on the plea of self-defense and offered testimony to sustain their contention. They were convicted of manslaughter, and appealed from the judgment upon the verdict.

STATE *v.* ROBERTSON.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*

*Smith & Shipman for defendant.*

WALKER, J., after stating the case: The prisoners introduced as a witness Mrs. Minnie Foster, who gave material testimony in their behalf. The State, for the purpose of impeaching her, handed her a letter. The case states: "This letter was lost by the prosecutors during the trial, and could not be produced. The letter in substance was very affectionate and very solicitous that Will Harris should visit Mrs. Foster at times when Foster, her husband, was absent, and was sufficient to indicate that the writer was seeking amorous and illicit intercourse with Harris. Counsel read the letter at length to witness, and she said: 'I never wrote it to Will Harris for myself, and nobody need say I did. I wrote it for Fairy, if it is the one I wrote. I was in jail once; stayed pretty near five weeks. They never have had me in the lockup.'" If the witness had denied that she had written the letter, the matter being collateral to the issue, her answer would have been final and could not have been contradicted. But she admitted its authorship, adding merely that she wrote for her daughter, Fairy Foster, and the letter itself disclosed that she was having or wished to have illicit relations with Will Harris, in the absence of her husband. This, of course, tended to impeach her character and to impair her credibility. It was just as competent, for this purpose, as if she had admitted having a conversation with Harris to the same effect. Her statement that she wrote for her daughter tended further to impeach her, as the letter, on its face, conclusively proved the contrary. It was the contents of the letter, written by her, that impeached her character. This Court said in *S. v. Davidson,* 67 N. C., 119: "The doctrine, in regard to asking questions of witnesses, tending to disparage them, has been greatly modified in modern times, and it is now held that you may put almost any question to the witness, and that the witness is bound to answer it, unless the answer might subject him to an indictment, or to a penalty under the statute. The question, we think, should

have been permitted, and he was bound to have answered it."
*S. v. Exum,* 138 N. C., 599; *S. v. Fisher,* 149 N. C., 557; *S. v.
Holly,* 155 N. C., 485.

We have conceded the general rule, as stated in 1 Greenleaf
on Evidence, sec. 449, cited by the prisoner's counsel, as follows:
"It is a well-settled rule that a witness cannot be cross-examined
as to any fact which is collateral and irrelevant to the issue,
merely for the purpose of contradicting him by other evidence,
if he should deny it, thereby to discredit his testimony. And if
a question is put to a witness which is collateral and irrelevant
to the issue, his answer cannot be contradicted, but is conclusive
against him." See, also, *S. v. Patterson,* 24 N. C., 346.

In this case, though, Mrs. Foster was impeached by her own
admission that she wrote the letter and the very nature of its
contents. The letter, therefore, was not introduced to contradict
her, but merely to show the bearing of her admission as to its
authorship.

The prisoners relied on *S. v. Holly, supra,* but their contention
in this respect grows out of a misapprehension as to the scope
of that decision. There it was proposed to show by a witness,
introduced by the prisoner to prove his good character, that it
was rumored Holly had killed his wife. This was going into
details. It was competent to test the value of the witness's
opinion as to his general character, but not to call for hearsay
as to specific acts. This is an eminently just rule, as will appear
from these reasons, stated by *Justice Allen* in that case: "The
defendant did not testify in his own behalf, but he was entitled
to introduce evidence of his good character, as a circumstance
tending to show the improbability of his having committed the
crime alleged against him. *S. v. Laxton,* 76 N. C., 216; *S. v.
Hice,* 117 N. C., 783. When he avails himself of this right, the
State can introduce evidence of bad character, but cannot, by
cross-examination or otherwise, offer evidence as to particular
acts of misconduct. The rule is just, and based upon sound rea-
son. A party charged with crime may be prepared to defend an
attack upon his general character, which is a single fact, but he
could not have at the trial witnesses to explain the conduct of a
lifetime. Again, questions of this character, if permitted, would

tend to multiply issues, would needlessly prolong trials, and would be calculated to distract the minds of jurors from the real issue. If a witness may state that he has heard that the defendant had been charged with killing his wife, the defendant ought to be allowed, in reply, to show that the charge is false, and to do so might involve the examination of many witnesses. If one collateral question of this character can be raised and tried, the same rule would permit a hundred others. The authorities in this State are numerous and uniform that it is error to allow such questions on the cross-examination of a witness as to character." But that is far from sustaining this objection. We are not admitting evidence of specific or isolated acts, in regard to another witness's character, but only the admission of the witness herself as to her own virtue and chastity.

The second exception was taken to the refusal of an instruction that there is no evidence of Robertson's guilt. He was the aggressor and gave the first provocation that brought on the fight. The evidence showed that he handed the pistol to Ceph Foster, who killed the deceased with it, and also told him to shoot. He was not without fault, but, on the contrary, was the first and principal offender, and he therefore lost the benefit which otherwise he might have derived from the principle of self-defense. *S. v. Blevins,* 138 N. C., 668; *S. v. Lucas,* 164 N. C., 471. A killing with a deadly weapon being shown and admitted, the burden was upon the prisoner to show matter in excuse or mitigation. There was evidence that Robertson was present, aiding and abetting Foster in the commission of the homicide, and the judge properly refused the prayer for instruction. Revisal, sec. 3287; *S. v. Whitson,* 111 N. C., 695; *S. v. Chastain,* 104 N. C., 900; *S. v. Cockman,* 60 N. C., 484; *S. v. Simmons,* 51 N. C., 21; *S. v. Hildreth,* 31 N. C., 440; 12 Cyc., 186; 21 *ibid.,* 683. "Where, in a trial for murder, it appeared that two persons had formed the purpose of wrongfully assailing the deceased, and one of them, in furtherance of such purpose, with a deadly weapon and without provocation, slew him, it was held that both were guilty of murder." *S. v. Simmons, supra.* See, also, *S. v. Gooch,* 94 N. C., 987. There was nothing to excuse the killing, and defendant Robertson clearly participated

in it, and, as we have said, played an important and active part; he provoked the fight and was a leader in the fray, and is guilty of manslaughter, at least. *S. v. Garland,* 138 N. C., 675.

The third exception, taken to the refusal of the court to charge that Foster had the right, in his own house, to prevent the commission of a felony, is also untenable. He had that right, it is true, if exercised in a proper and lawful way; but it must be remembered that Milton Patterson was retreating when he first fired, and then Foster continued to shoot at him when there was absolutely no necessity for doing so in order to protect himself or his home, and he showed no remorse, after the killing, for his cruel act, but was wholly indifferent to the homicide, expressing even satisfaction at the tragic result. The manner of the killing by Foster, his acts and conduct attending its commission, and his declarations immediately connected therewith, were evidence of express malice. 21 Cyc., 889, 897, 924, 925; *S. v. Jarratt,* 23 N. C., 76. "The fierceness and atrocity of the attack, the circumstances under which it was made, the nature and extent of the injury inflicted, the condition of the body and wearing apparel, the deadly nature of the weapon used and the manner of using it, and all other facts constituting the *res gestæ,* are proper subjects of inquiry on the question of malice and intent. Subsequent statements of the accused showing that his hatred of the deceased was so intense that it pursued him beyond the grave, are admissible on the issue of express malice. So, also, on a trial for assault with intent to murder, subsequent statements of the assailant showing bitter hatred toward the person assaulted are admissible to show malice at the time of the assault. Any unseemly conduct toward the corpse of the person slain or any indignity offered it by the slayer should go to the jury as evidence of malice. His jeerings at the weeping relatives and friends of the deceased may be considered as bearing upon the question of the malice of the accused." 21 Cyc., pp. 897, 898.

There is no circumstance in the case which can be fairly regarded as upholding the contention that Foster was defending "his castle" or his property or any member of his family. It was nothing but a common brawl, for which he and Robertson, his codefendant, were mainly responsible. The principle

that a man may defend his home against unlawful and unwarranted attacks has no application to these facts.   21 Cyc., 828; 1 Bishop Cr. Law (11 Ed.), 614, 806, and sec. 636; *S. v. Taylor,* 82 N. C., 554.

The fourth assignment of error to the charge of the court, that if defendants fought willingly they cannot avail themselves of the principle of self-defense, is sufficiently answered in *S. v. Garland,* 138 N. C., 675, by *Justice Hoke:* "It is the law of this State that where a man provokes a fight by unlawfully assaulting another, and in the progress of the fight kills his adversary, he will be guilty of manslaughter at least, though at the precise time of the homicide it was necessary for the original assailant to kill in order to save his own life.   This is ordinarily true where a man unlawfully and willingly enters into a mutual combat with another and kills his adversary.   In either case, in order to excuse the killing on the plea of self-defense, it is necessary for the accused to show that he 'quitted the combat before the mortal wound was given, and retreated or fled as far as he could with safety, and then, urged by mere necessity, killed his adversary for the preservation of his own life.'   Foster's Crown Law, p. 276.   The same author says on page 277: 'He, therefore, who in case of a mutual conflict would excuse himself on the plea of self-defense must show that before the mortal stroke was given he had declined any further combat and retreated as far as he could with safety, and also that he killed his adversary through mere necessity and to avoid immediate death.   If he faileth in either of these circumstances he will incur the penalty of manslaughter.'   To the same effect is *Lord Hale,* who lays it down, 'That if A. assaults B. first, and upon that assault B. re-assaults A., and that so fiercely that A. cannot retreat to the wall or other *non ultra* without danger of his life, and then kills B., this shall not be interpreted to be *se defendendo,* but to be murder or simple homicide (manslaughter), according to the circumstances of the case; for, otherwise, we should have all the cases of murder or manslaughter, by way of interpretation, turned into *se defendendo.'*   This principle was approved and applied in this State in *S. v. Brittain,* 89 N. C., 481."   See, also, *S. v. Yarbrough,* 8 N. C., 78, and substantially to the same effect,

*S. v. Simonds,* 154 N. C., 197; *S. v. Clark,* 134 N. C., 698; *S. v. Brittain,* 89 N. C., 481; *S. v. Dixon,* 75 N. C., 275. But in this case the prisoners not only fought willingly, but aggressively, and the whole difficulty is traceable to their conduct.

There was no error in that part of the charge relating to the presumption arising from killing with a deadly weapon, and as to the burden of proof. The court stated that the law presumes malice from such a killing, and that, nothing else appearing, it would be murder in the second degree, and the burden is upon the prisoners to satisfy the jury as to any matter of justification, excuse, or mitigation. This is the correct rule. *S. v. Yates,* 155 N. C., 450; *S. v. Rowe, ibid.,* 436; *S. v. Simonds,* 154 N. C., 197; *S. v. Brittain,* 89 N. C., 481. See, also, *S. v. Cox,* 153 N. C., 638; *S. v. Worley,* 141 N. C., 764. If the prisoners desired any fuller or more exact instructions, they should have asked for them by a specific prayer, those given being substantially correct. *Simmons v. Davenport,* 140 N. C., 407; *McKinnon v. Morrison,* 104 N. C., 354; *Pate v. Bank,* 162 N. C., 508; *Monds v. Dunn,* 163 N. C., 108. This is the settled rule.

The last assignment of error to the instruction of the court, as to the different verdicts that could be returned, according as the jury might find the facts to be, is not supported by the record. The judge distinctly told the jury, several times, that they could acquit the prisoners, and the last instruction was intended merely to inform them how they could find in the event that they did not acquit. The charge must be construed as a whole. *S. v. Exum, supra.*

A careful review of the record has disclosed no error which entitles the prisoners to another trial.

No error.