The defendant was tried in the municipal county court of the city of Greensboro upon a warrant charging him with operating a lottery in the city of Greensboro and having in his possession "tickets, certificates or orders" used in the operation of said lottery, in violation of chapter 434, Public Laws of 1933, and convicted of this offense. A sentence of six months upon the roads, suspended upon payment of the costs and fine, totaling $175, was imposed. The defendant appealed to the Superior Court, and at a regular term of the said Superior Court, presided over by Johnson, Special Judge, the cause was brought to trial and the defendant was again convicted and sentenced to the roads. From this judgment, defendant appealed.
In the argument here, counsel for defendant challenged the validity of the trial in two respects: The refusal to allow judgment as of nonsuit upon the demurrer to the evidence; and the rejection of record evidence of the prior convictions of State's witness G. M. Sneed of several violations of the criminal law, which, it is contended, went to his credibility as a witness.
Sneed was a plainclothes man on the police force of the city of Greensboro, assigned to the investigation and detection of defendant's operations in violation of the lottery laws, and the State relied principally upon his testimony for conviction. *Page 330 
1. Sneed testified that he saw the defendant in the act of operating tip boards, selling tickets therefrom, comparing them with the sealed or winning number, and paying off the winners. This was certainly sufficient to take the case to the jury.
2. On cross-examination of Sneed, numerous impeaching questions were addressed to him and variously answered, substantially as follows:
"Q. I ask you if you did not get two years on the roads, suspended on the condition that the defendant pay $3.00 a week to the Clerk of Superior Court for the use of Rilmer. Have you got a daughter named Rilmer, or is that your wife?
"A. That is my wife.
"Q. `And upon failure, sentence to become operative. Defendant to remain of good behavior.' Was that not the sentence they gave you?
"A. I am not positive.
"Q. On November 2, 1936, you were indicted for the possession of liquor, called and failed. How about that?
"A. Indicted for liquor and ran away.
"Q. Let me ask you another. I ask you if they did not have you up again for assault on a female, and you plead guilty, six months on the roads, suspended on condition that you not assault your wife any more. How about that?
"A. We were in family trouble.
"Q. In that order, they said you were to pay one-half of your weekly wages received from the Shoaf-Sink Hosiery Mill to be paid to Rilmer Sneed?
"A. I remember paying her on some occasion, but I don't remember the date. She went up and taken all that up.
"Q. I ask you if you were not convicted that time of going over and going into the house and causing trouble with her, and if you did not come up and plead guilty?
"A. I would not say.
"Q. See if you remember this. On November 27, 1939, I ask you if you were not indicted again for assault on a female and came up and plead guilty and got six months on the roads for that?
"A. Not as I know of.
"Q. Coming on to May 27, 1940, at that time, you got so drunk that you were guilty of disorderly conduct. They had you up for that?
"A. I was drunk; yes, sir.
"Q. And you were disorderly?
"A. I don't remember about that.
"Q. Did you not plead guilty May 27, 1940, for disorderly conduct and judgment was suspended for twelve months?
"A. I don't know anything about it. *Page 331 
"Q. So out of all those occasions that I have just read to you, will you swear that you were not up every time that I asked you about and that they did not give you the judgments that I read to you? What I want to know, is that record right or wrong?
"A. So far as my knowledge, it is wrong."
When defendant's turn came to present evidence, he caused to be identified and offered in evidence certain records from Davidson County for the purpose of showing that witness had been convicted of various specified offenses, including unlawful possession of liquor, assault on a female, failure to provide support for his wife and child, and disorderly conduct. The proffered evidence was ruled out, and as to each item so excluded defendant excepted.
There are other exceptions which we find it unnecessary to discuss, as they present no novel features.
The question presented is whether a witness, not himself a party, may be impeached by record evidence of his conviction of crime, introduced either in contradiction of his denial thereof, or independently as evidence going to his credibility.
The admission of extrinsic evidence, particularly record evidence of conviction of crime, for the purpose of impeaching a witness is, under varying conditions and limitations, rather general in this country. In some jurisdictions its introduction is authorized and controlled by statute; in others, by rules of evidence locally recognized. The practice has not been adopted here, and the uniform usage of the courts, existing over a long period, may be regarded as unfavorable to the recognition of this mode of proof. Moreover, the test ordinarily applied here — that of general character, which with us means reputation — is based upon a consistent theory, which prefers an estimate of character based on the current experience of the community in which the witness lives, rather than proof of particular acts — a sort of mosaic pattern built up before the jury out of heterogeneous piece-material, often of doubtful significance and of little relevancy.
Therefore, our courts do not permit the witness to be impeached by independent evidence of particular misconduct. Barton v. Morphes,13 N.C. 520; S. v. Bullard, 100 N.C. 486, 6 S.E. 191; Nixon v. McKinney,105 N.C. 23, 15 S.E. 154; S. v. Warren, 124 N.C. 807, 32 S.E. 552; S.v. Arnold, 146 N.C. 602, 60 S.E. 504; S. v. Holly, 155 N.C. 485,71 S.E. 450; S. v. Maslin, 195 N.C. 537, 143 S.E. 3; S. v. Colson,194 N.C. 206, 139 S.E. 230; S. v. Winder, 183 N.C. 776, 111 S.E. 530;S. v. Bailey, 179 N.C. 724, 102 S.E. 406. A somewhat different rule applies to cross-examination, where the purpose, as Wigmore puts it, is to "sift the witness." There questions relating to crime and anti-social conduct are freely allowed. But the latitude *Page 332 
allowed is peculiar to cross-examination — no doubt a survival of a franker age, of rough-and-tumble practice, with few holds barred. And here, the answers of the witness are regarded as collateral to the issue and the examiner is bound by them.
In this connection, we may say much criticism has been directed at the latitude allowed on cross-examination, especially in quizzing the witness as to anti-social conduct and the commission of crime. Where there is a suspicion that the examination is not in good faith, there is perhaps no other feature in the conduct of a trial that has received so much universal condemnation amongst laymen. The eminent counsel who conducted this cross-examination made no departure from strict propriety; but all such examinations are not so obviously in good faith. In many jurisdictions questions as to commission of crime are not permitted at all, unless addressed to those offenses which have an obvious relation to the virtue of veracity. 70 C. J., Witnesses, sec. 1097 (cc).
The theory that proof of particular acts or conduct is rejected solely to prevent confusion of the issue and for the convenience of the courts, and therefore the rule should yield to the conclusiveness and certitude of record proof which raises no issue it does not settle, is not wholly satisfying. As presented here it is full of danger and possible injustice, because of the lack of relevancy to the purpose which must in many instances ensue, the exaggerated effect of the mode of proof, and the fact that the witness is cut off from any explanation or extenuation of the offense. We could not adopt the innovation urged upon us without raising other related problems of a serious nature which would probably occupy our attention for a decade, at least.
At common law, a person who had been convicted of certain offenses was disqualified to testify as a witness. The disqualifying offenses were those classed as infamous, as involving moral turpitude, and the crimen falsi
— such as false pretense, fraud, cheating, and other crimes indicating a disposition to falsify. Infamous crimes and those involving moral turpitude challenged the integrity of the whole moral fiber. In removing this disqualification, in many of those jurisdictions which permit impeachment of the witness by official record of conviction, either the statutes or the rules of the court pay deference to the common law classification by limitations respecting the nature of the offenses which may be so used. Differences in phraseology there are, but the general purpose and import is the same. See 28 R. C. L., Witness, sec. 212; Notes, 82 A.S.R., 37; 70 C. J., Witness, sec. 1052 (9), and notes; Wigmore on Evidence, 3rd Ed., sections 980, 987.
The general purpose of the statutes and rules which pretend to any scientific justification is to confine the intended impeachment to proof of those crimes which more directly and reliably bear on credibility. *Page 333 
It would be a barbarous rule which called in question a man's veracity because of the violation of a petty traffic law of which he may not have any knowledge. There are many graver offenses whose bearing on the question of veracity or credibility is no less remote.
None of the offenses appearing against witness in the criminal records of Davidson County, reprehensible as they are, is classified at common law as involving moral turpitude, infamous, or as crimen falsi, and in the most discriminating jurisdictions, either by statute or rules recognized by the courts, they could not be used independently to impeach the witness. In others, the wide open rule would admit them all on record proof.
In Wigmore on Evidence, 2d Ed., sec. 413, we find the following overall comment: "The tendency is to a simplicity of the rule defining the kinds of crime (i.e., either all crimes or felonies only) instead of the common law subtleties."
In Wigmore on Evidence, 3d Ed., section 980, we find the following postulations:
"What crimes are relevant to indicate bad character as to credibility? There are here three answers possible on principle: (a) Whatever offenses were formerly treated as disqualifying one entirely as a witness shall now be treated as available for impeachment. This is the commonest solution, and has come about usually by express proviso in the statutory abolition of the former disqualification; (b) If in a given jurisdiction general bad character is allowable for impeachment, then any offense will serve to indicate such bad character; (c) If character for veracity only is allowable for impeachment, then only such specific offenses may be used as indicate a lack of veracity-character."
As to the second postulate, we must bear in mind that when in our practice a "character witness" is asked about the general good or bad character of another, it is understood the inquiry is about the reputation of the witness. The question involved is not wholly one of relevancy, but primarily of the reliability and fairness of the test applied. It is conceived that an estimate derived from current conduct of the witness, as observed and experienced by members of the community who have a knowledge of him, may be more just and accurate. If any criticism is due, it might be directed to the reluctance of the court to permit direct inquiry, in the first instance, into the reputation for veracity. But this is not within the scope of our present inquiry.
In such a welter of confusion, we feel the wisdom of the conclusion thus expressed in Nelson v. Seiler, 154 Md. 63: "No line can be definitely established, that is to say, any line undertaken to be established would be, in its nature, arbitrary; and if such is to be established, it is a question for the legislature and not for the court." *Page 334 
We have felt it best to clarify the attitude of the Court so counsel may not consider the contribution they have seriously offered to the amendment of our jurisprudence wholly as "love's labours lost." It is thought, however, that we do not necessarily come to grips with this question on the record presented. Most of the answers to the impeaching questions asked the witness on cross-examination may be construed as admitting conviction of the offenses suggested, and those of an equivocal nature are too unimportant to have influenced the result, and the rejection of the record evidence to the same effect we do not regard as prejudicial error.
Other exceptions are not meritorious.
We find
No error.