The defendants, together with one O. H. Harrison, who was at the time of the trial dead, were indicted for highway robbery from the person of one L. K. Nicholson, who testified that on 5 November, 1902, he came to Kinston with a load of tobacco. That after making some purchases and buying some whiskey he started home. That he (646) took the wrong road and was turned back. That his horse's feet got entangled in a tramway near the Becton place. Some one stopped the horse. It was too dark for witness to tell who they were except by the color of their hair. That a ginger-cake-colored negro came around the wagon and placed a gun in witness's face, and another one came around on the other side and pulled his gun on witness; then the third one came up with a gun. It was a clear, open place. Witness did not see where they came from. They had two double-barrel guns and a single-barrel shotgun. They demanded his money. Witness told them that he had none. One of them said witness was a liar, that he saw witness go along that morning to Kinston with tobacco. That he had some money in his pocket; pulled it out and gave it to them. They then *Page 496 
walked off. One of them said "Let's kill him." Another one said that would be too bad. That they asked witness if he had any whiskey. They reached in the wagon and got out a small jug of whiskey. That witness went about two miles and stopped at a schoolhouse, where they were having prayer-meeting. Told persons there that he had been robbed by three negroes, but could not tell who they were. Witness they went on some three or four miles from the place of the robbery to John Dail's house and told him about it. Stayed all night at Dail's house. That he left for home early in the morning. That some persons came after him and told him to come back, that they thought they had found out who robbed him. They went back down in the neighborhood of the robbery. Witness swore out a warrant against the defendants. That he saw Robert Faucette after he was arrested, but could not identify him as one of the men. Witness then saw Henry Graham, but could not identify him as one of the men. That he "sorter thought that Harrison had a voice like one of the men that robbed him." That he did (647) not make any outcry about being robbed. That he did not tell George Holland that he had been to Kinston and gotten drunk and played hell, or that his wife and children needed very cent that he had worked for. Witness said that he did not know whether Graham was one of the parties or not; that he could not identify either him or Richard Faucette as one of the negroes that robbed him. That he did not make any effort to find out who robbed him. That he was on his way home when overtaken the next morning and told to come back. That he lived in Duplin County and farmed on the land of L. M. Cooper. That he did not tell Cooper that he was robbed. That he bought a quart of wine from John Dail on his way to Kinston the morning that he was robbed, and bought two jugs of whiskey in Kinston. That he had the pocketbook that he had in his pocket on the night of the robbery.
There was other testimony to the effect that O. H. Harrison and the two defendants were in a buggy drawn by a mule going in the direction of Neuse River lowgrounds about 10 o'clock in the morning. That they had guns in the buggy and said they were going hunting. That they had bought a quart of wine that morning. It was also in evidence that they were seen about sunset with two single-barrel guns and a double-barrel gun about a mile and a half from the scene of the alleged robbery. They said that they had been out hunting. Two witnesses by the name of Jarman testified that early in the morning after the alleged robbery of Nicholson they went in pursuit of him and overtook him a few miles from Dail's house on his way to his home in Duplin County. That they informed him that three colored men with guns were seen on the public road the previous *Page 497 
evening, and they prevailed upon him to return and get out a warrant for those men. It was in evidence on the part of the defendants that the prosecutor came to the house of George Holland about 7 o'clock on the night of the alleged robbery. That he hailed at the gate. (648) That he said he had been to Kinston with tobacco; that he had gotten drunk and played hell; that his wife and children needed all the money he had worked for. That he asked Holland to take a drink with him. That he did not appear excited at all and did not say anything about being robbed. That Holland's house was about a mile and a quarter from the place of the alleged robbery. This conversation was immediately after the time of the said robbery. There are several houses on the road before Nicholson got to Holland's house, and they are all occupied by families, and the houses are near the road, in speaking distance of the road. It was also in evidence by the witness Davis that the prosecutor stated that he had a conversation with Holland, but he did not tell him anything about the robbery; that he said he could not identify the negroes except by the color of their hair; that they had two double-barrel breech-loading guns and one single-barrel shotgun; that a ginger-colored negro put his gun in his (prosecutor's) face and demanded his money, and he told him he had no money; the negro told him he was a liar; that the day after the arrest of the defendants the prosecutor was carried before defendant Faucette and asked in Faucette was one of the negroes that robbed him, and he said "No"; that he looked at Harrison and said he did not think he was one; that he was then carried in the presence of the defendant Graham and asked if he was one of the negroes that robbed him, and he said he was not. That the place of the alleged robbery was a clear, open place, and in full view of Albritton's house, three hundred yards from the place. That there were four houses between where the alleged robbery was committed and the schoolhouse where they were holding prayer-meeting, and these were all in speaking distance of the public road. The defendant Graham said that Faucette and himself went squirrel hunting in the morning; they went to the river lowground, and passed Harrison's house and he went with them. He (649) testified, in regard to his movements of the day of the alleged robbery, that he did not know the prosecutor, and never saw him until after he was arrested; that he did not meet him on the road, and knew nothing of his being robbed. Faucette testified to the same effect. It was also in evidence that Albritton, who lives about three hundred yards from the place of the alleged robbery, was plowing in his field until after sundown; that he had fed his team and was standing around in the yard at dark; that he heard some one driving rapidly over the bridge across the public road, and he looked out and saw a man in a one-horse wagon, with some furniture, running his horse; that he was sitting up in the *Page 498 
wagon holding the reins with both hands and had the horse under control; that he examined the place of the alleged robbery and could find no sign of buggy tracks or any men's tracks; that the prosecutor, before he reached the schoolhouse where they were having prayer-meeting, had to pass by the witness's house, which is on the road, and he also had to pass other houses; that he did not see the negroes pass that evening, and he knows the defendants and they live in his neighborhood. There was testimony on the part of Dr. Wooten, coroner of the county, D. F. Wooten, sheriff of the county, and others, that the character of the defendant Graham was good. Granger testified to the good character of the defendant Faucette. L. M. Cooper, with whom the prosecutor lived, testified that he had known the prosecutor for twenty-five years; that he rented a farm from him; that his general character was bad, and that he never told the witness anything about the robbery. There was also testimony to show that the prosecutor was seen on the day of the alleged robbery asleep in his wagon. Witness thought that he was drunk, and told him he was on the wrong road, and he had to go back. It was in evidence that the prosecutor, on the day of the alleged robbery, was driving in a single-horse (650) wagon carrying furniture. In reply there was testimony on the part of the State that the prosecutor was heard speaking of the alleged robbery the day following, and that he said that it was impossible for him to tell who the parties were. Some one asked if he could identify them in any way, and he said it was impossible for him to tell whether the men arrested were the right men or not; that the general character of the defendant Faucette was not very good. There was also testimony that the character of the prosecutor was good.
The defendant's counsel requested the court to charge the jury that upon the whole evidence they could not be convicted. This was refused, and defendants excepted. The record states that the court in its charge to the jury said: "Where were the defendants during the long time that elapsed after their reaching the tramroad? Were they concealed in the bushes on this side of the tramroad and near the public highway, watching the approach of Nicholson? As to this matter, the jury have the right to consider the length of time which it took the defendants to make the journey on their return from the river lowgrounds to their home, and that part of this time could have been occupied in lying in wait near the roadside." It is stated in the record that no contention was made by counsel for the State that the defendants had concealed themselves in the bushes on the Kinston side of the tramroad, which crosses the public road, and which was the scene of the alleged robbery, and lain there to watch for the approach of the prosecutor, to rob him.
It appears by the record that the judge further charged the jury that "the testimony of witnesses interested in the event of an action, as the *Page 499 
defendants are in this case, is to be regarded with suspicion and carefully scrutinized by the jury, but the character which has been proved for them is also to be considered and given such weight as the jury may think it deserves. The defendants are interested in the verdict (651) to be rendered in this cause and in keeping themselves from being sentenced to imprisonment in the penitentiary, which the law affixes as a punishment for the crime with which they are charged in this indictment; you will weigh their testimony as that of persons having such an interest in the event of this action, and also consider the good character proved for them, and you will give their testimony such weight as you may think it entitled to under all the circumstances."The defendants excepted to this part of the charge and appealed.
It is by no means clear that, taking the testimony of the witnesses introduced by the State to be true, it did more than raise a suspicion of the defendant's guilt. The Attorney-General, with his usual candor, conceded that the charge of the judge, in regard to the manner in which the jury should consider the testimony of the defendants in their own behalf, was not in accordance with the decisions of this Court. We well understand that it is often difficult for the court to restrict itself to the use of expressions, in charging the jury, which are, under a critical examination, entirely free from objection. We would not grant a new trial for such cause unless it clearly, or at least reasonably, appeared that the language used was calculated to prejudice the defendant or mislead the jury. It is clear that, in stating the contentions or theories of the State and defendants, the judge should state only such as are supported by some evidence. It is well settled by numerous cases in this Court, that an instruction which involves a theory, in support of which there is no evidence, should not be given. It would be an invitation to the jury to speculate upon possible theories and base their verdict on such speculation rather than upon the (652) evidence. We do not discover any testimony upon which to base the theory that the defendants concealed themselves in the bushes near the public highway to watch the approach of the prosecutor. There is no evidence that there were any bushes on the side of the road. The prosecutor said: "It was a clear, open space." The form of expression adopted by the judge was, we think, calculated to prejudice the defendants; it conveys to the mind the impression that the judge thought that it was incumbent upon the defendants to account for themselves and explain their movements during the day. *Page 500 
In regard to the second exception: In S. v. McDowell, 129 N.C. 523,532, the court instructed the jury to "scrutinize the evidence of the prisoner's relations with great caution, considering their interest in the result of the verdict, and after so considering the jury will give it such weight as they may deem proper." This was held by this Court to be erroneous, following the rule laid down in S. v. Collins, 118 N.C. 1203.
In S. v. Holloway, 117 N.C. 730, the instruction was that the jury "had a right to scrutinize the testimony of the defendants and receive it with grains of allowance on account of their interest in the event of the action." This upon exception was held erroneous, the Court saying the "This charge is capable of misleading the jury into the impression or belief that the evidence of interested parties is to be to some extent discredited, although the jury may think the witness is honest and has told the truth. His Honor should have gone further and explained to the jury, after having called their attention to the interested relation of the witness, that if they believed the witness to be credible they should give to his testimony the same weight as other evidence of other (653) witnesses." A charge conforming to this rule, in S. v. Byers, 100 N.C. 512, was approved by this Court; also, in S. v. Boon,82 N.C. 637.
In S. v. Lee, 121 N.C. 584, this Court disapproved the following "strong and significant language": "The wife is a competent witness in behalf of her husband, but in view of the close relationship between them, and the cloud of suspicion cast upon her testimony, the law says the jury should scrutinize her testimony with great severity."
In S. v. Apple, 121 N.C. 584, the Court approves the instruction to the jury: "It was their duty to scrutinize the testimony of near relations, but they could not reject it on that account, and that, after thus scrutinizing their testimony, if they believed they had sworn the truth, they should give it the same weight as if they were not related to the defendant."
His Honor's instruction upon this point is not in accord with the rule laid down by this Court.
For the error pointed out the defendants are entitled to a
New trial.
Cited: Herndon v. R. R., 162 N.C. 321, 323; S. v. Fogleman, 164 N.C. 464. *Page 501