Criminal prosecution tried upon indictments charging the defendants, pursuant to an unlawful conspiracy or confederation, with (1) the murder of O. F. Aderholt; (2) felonious secret assault upon T. A. Gilbert; (3) felonious secret assault upon A. J. Roach, and (4) felonious secret assault upon C. M. Ferguson.
STATEMENT OF THE CASE.
The case grows out of a strike begun 1 April, 1929, and conducted by the local branch of the National Textile Workers Union at the Manville-Jenkes Company's Loray Mill in Gastonia, North Carolina. Headquarters of the union were first established on West Franklin Avenue, and a few doors away the Workers International Relief, an organization designed to care for strikers and their families, had its headquarters. These union and relief headquarters were demolished on the night of 18 April by persons unknown, or at least not disclosed by the record. Members of the union then proceeded to construct new headquarters on North Loray Street on a lot leased for the purpose by the National Textile Workers Union. Here they erected a hall and a number of tents for storing supplies and housing strikers and their families.
Fearing a repetition of what had happened to their headquarters on Franklin Avenue, and not being willing to trust to the protection of the "one-sided Manville-Jenkes law," as was stated in a letter to Governor Gardner by a member of the strike committee, under date of 16 May (written with the approval of the defendant Beal), the strikers and members of the union supplied themselves with firearms, shotguns, pistols, etc., established a voluntary system of patrol, and, in this way, "determined to defend the new union headquarters at all costs." Holes were cut in the front wall of the building through which guns could be fired without disclosing the identity of the gunners to any one on the outside.
Meetings were held in the front yard of the premises from time to time, in fact nearly every evening, at which the progress of the strike and the condition of the workers were discussed by different speakers, *Page 283 
and after the close of the meetings five or six guards, armed with shotguns, usually remained to patrol the property.
The evidence tends to show that, at one of the meetings, probably during the latter part of May, the defendant Beal, in an address to the workers, advised them that they were going to "pull a strike" at the Loray Mill; that he had sent a delegation to Washington to straighten the matter out with the government; that the bosses, thugs from the mill, and officers of the town were trying to tear up their union and break up their meetings, but "they were a fighting union — not dreading the police at all — let them come when they wish" — that he had instructed the guards to be constantly on the alert and to protect everything against all comers, police, mill thugs or bosses; and that the only way to win the strike was to shut down the Loray Mill.
On the night of 7 June, 1929, an encounter took place between police officers of the city of Gastonia and those in charge of the union premises, which resulted in the killing of O. F. Aderholt, chief of police, the wounding of officers Gilbert and Ferguson, and A. J. Roach who came with the police, and Joseph Harrison, one of the strikers.
Of the seven defendants tried and convicted, three came to Gastonia in connection with the strike, Fred Erwin Beal (age 33) of Lawrence, Mass., as Southern organizer for the National Textile Workers Union; Clarence Miller, of New York, as organizer of the Youth's Section of the union, with his wife (age 20), who organized the Children's Section, and George Carter (age 23), of Mispah, N. J., who read about the strike and came because he was interested in strikes. The remaining four, W. M. McGinnis, Louis McLaughlin, Joseph Harrison and K. Y. Hendricks (age 24), are residents of Gastonia.
True bills were returned by the grand jury of Gaston County against the defendants and nine others, and, at the instance of those indicted, the cases were removed to Mecklenburg County for trial.
 August Special Term, Mecklenburg Superior Court, Barnhill, J., Presiding.
At the request of counsel for the defendants and under instruction from the court, a bill of particulars was filed by the solicitor, to which the defendants demurred. This was overruled, but on suggestion from the court, the solicitor filed an additional bill of particulars, detailing facts tending to show a conspiracy on the part of the defendants to resist the officers and to prevent their entry on the union grounds upon which the State expected to rely for a conviction on the charge of murder. The defendants again demurred on the ground of duplicity in the bill and indefiniteness in the charge; overruled; exception. *Page 284 
All sixteen of the original defendants were then put on trial (presumably for the capital offense) under the indictment charging them with the murder of O. F. Aderholt. During the progress of this trial, and after a number of witnesses had been examined, one of the jurors suffered an acute attack of emotional insanity and became wholly incapacitated for further jury service; whereupon on Monday, 9 September, 1929, about the hour of 10 a.m., the court, as a matter of necessity, withdrew a juror and ordered a mistrial, remanded the defendants to the custody of the sheriff, continued the cause, and took a recess until 2:30 p.m. The defendants thereupon moved for their discharge; overruled; exception.
After entering the above order and before leaving the bench, but after the jury had been discharged, the court discovered that one of the defendants was not present in court when the order of mistrial was entered, whereupon the absent defendant was sent for and after learning that he was ill and had left the court room at his own request, in the custody of the sheriff, the court at 11 a.m. directed the clerk to strike out the entry, "recessed until 2:30," and in the presence of all the defendants, the entire proceedings of the day were repeated, except the defendants declined to renew their motions. Objection to this procedure; overruled; exception.
 September Special Term, Mecklenburg Superior Court, Barnhill, J., Presiding.
The defendants were again placed on trial at a special term of court which convened 30 September, 1929. Immediately after the opening of court the defendants, and each of them, moved for their discharge upon the ground that they had once been put in jeopardy and ought not to be tried again on the same indictment; overruled; exception.
Announcement having been made in open court that the State would not ask for a first degree verdict on the murder charge, but for a verdict of second degree only, or manslaughter, as the evidence might disclose, the solicitor moved that the four bills of indictment be consolidated and tried as different counts in a single indictment, which motion was allowed (without objection so far as appears from the record proper); whereupon anol. pros. with leave was taken as to all the defendants, save the seven above mentioned who were ruled to trial over their renewed objections.
THE EVIDENCE.
On the evening of 7 June, 1929, a largely attended meeting was held on the union grounds. The gathering was addressed by Paul Shepherd, Vera Bush and the defendant Beal, each in turn speaking from a platform *Page 285 
in front of the building provided for the purpose. Although the strike had been in progress for a month or more, seven or eight hundred employees were still working in the Loray Mill, and it was the intention of the strikers to from a picket line and march to the mill that evening. Plans for the march were discussed by the speakers, and some of their remarks were quite extreme. A disturbance occurred while Vera Bush or Fred Beal was speaking, occasioned by someone throwing eggs or missiles at the speaker, followed by an effort on the part of some of the strikers to eject the intruder from the premises, during which a shot was fired by some unidentified person and several blows were struck. This created quite a bit of excitement and looked at first as if a riot might ensue, though no great harm resulted from it.
After the speaking, the picket line was formed and started towards the mill, but this was stopped and turned back by the police at the railroad crossing near Franklin Avenue — peaceably and by simple requests according to the testimony of the police; forcibly and by brutal assaults according to the evidence of the picketers. As the picket line, which never reached the mill, was returning between 9:00 and 9:30 p.m., Mrs. Walter Grigg telephoned police headquarters and said: "If we ever need your protection, we need it now on North Loray Street." In consequence of this call, four policemen, Chief Aderholt, Gilbert, Ferguson, Adam Hord, and with them A. J. Roach, got into a city car, a Ford sedan, and drove to the union headquarters.
The attitude of the crowd towards the officers as they arrived, including those in charge of the union premises, was other than sympathetic, if not actually threatening. A number of guards with shotguns were patrolling the grounds — some stationed within the building and others on the lot outside. As the officers came up and started upon the premises, some girls from across the street were heard to cry out and say, "Do your duty, guards! Do your duty!"
There is evidence tending to show that Aderholt and Gilbert, followed by Roach, were the first to enter upon the union lot. They approached one of the guards — either Harrison or Carter — who was asked by Aderholt: "What is the trouble here?" and received the reply: "It is none of your damn business." The guard then drew his gun upon Gilbert, who grabbed the gun and succeeded in taking it from him; whereupon the chief remonstrated with the guard, saying: "You ought not to draw a gun on an officer for nothing," and told Gilbert to put him under arrest for an assault in drawing his gun, which Gilbert did.
The evidence of George Carter is to the effect that he was the guard in question and that, as the officers approached, he walked over to meet them and asked Gilbert, who was in the lead, if he had a warrant, to which Gilbert answered: "I don't need any G___ d___ warrant." The *Page 286 
witness further testified that Gilbert then flashed a pistol in his face and grabbed his gun, taking hold of the barrel with his left hand. The State contends that Joseph Harrison was the guard first approached.
But passing for the moment this particular dispute, the evidence further tends to show that, leaving Gilbert and the guard (Harrison or Carter) where they had met near the front of the yard, Aderholt and Roach proceeded in the direction of the union hall, the former going to the back and the latter to the front of the building. Roach testified that he met a guard near the door, asked him what the trouble was, and received the reply, "None of your damn business." He told the guard to put up his gun, when some woman at the front hollered out, "You will find out whether they will shoot or not." On reaching the front door and looking inside, Roach said he saw four men, one of whom he recognized as the defendant Beal, with shotguns leveled towards him. Just at this time Chief Aderholt came from around the building and instructed Roach not to go inside. Aderholt and Roach then turned and rejoined Gilbert who was still in the front yard with the guard whom he had in custody.
As the three officers started away with the guard whom Gilbert had under arrest, there were shouts from outside as well as inside the building of, "Turn him loose!" and "Shoot them! shoot, shoot!" followed immediately by a shot which came from the direction of the building, then two more shots were heard, then a volley of 15 or 20.
When the smoke cleared away, it was discovered that Aderholt, Gilbert and Roach had been shot down, the first mortally, and the last two seriously, wounded. Joseph Harrison (who, according to the State's evidence, was in the custody of Gilbert at the time) was also wounded, as well as Ferguson, who remained near the automobile from the time the officers arrived on the scene.
It was the theory of the defendants that the injured officers were victims of their own guns, and to this end quite a bit of evidence was offered tending to show ill will or displeasure on the part of some towards the strikers, coupled with alleged threats to destroy the union headquarters and to break up the meetings held there; also, that Gilbert and Roach had been drinking on the afternoon and evening of 7 June (but this was strenuously denied, if not satisfactorily rebutted); and further that at the time the picket line was dispersed, Gilbert is alleged to have said to a fellow officer: "Let's go down there and kill the whole damn bunch of s___ o__ b___ s___. We had as well do it now as later."
On the other hand, the State alleged and offered evidence tending to show that the strikers had conspired to enter the Loray Mill on the evening in question and to remove therefrom, forcibly or otherwise, the employees engaged in their work; and had purposed to resist to the *Page 287 
death the officers of the law, should they interfere with their plans or come upon the union grounds. The view of the prosecution prevailed with the jury. That of the defense was rejected.
What part, then, if any, did each of the defendants take in this unfortunate tragedy, as disclosed by the State's case? For present purposes, the inculpatory evidence only need be stated, as the defendants have challenged its sufficiency by separate demurrers or motions to nonsuit under C. S., 4643. The exculpatory evidence, offered by the defendants, was not accepted by the jury. Indeed, the cross-examination of the defendants' witness, Paul Shepherd, gives strong corroborating support to much of the State's case.
FRED ERWIN BEAL.
The evidence tends to show that the defendant Beal had participated in a number of strikes, in the New England States, before coming to Charlotte in December, 1928, as Southern organizer and representative of the National Textile Workers Union — an organization which he helped to form of various unions during the previous September — that he went to Gastonia and organized a local branch of the union in March, 1929; and that on 1 April following, a strike was called at the Loray Mill. In addition to the advice which he is alleged to have given in a speech during the latter part of May, heretofore mentioned, his address at the union headquarters on the evening of 7 June (delivered apparently after the disturbance occasioned by the egg-throwing) brings him closer to the tragedy, as witness the following extracts, detailed by a number of witnesses:
"We are going to have the biggest strike we have ever had. . . . Go, fellow-workers, go . . . Go to the mill and drag them out." (R., pp. 63 and 71.) "From a picket line, go to the mill and go inside the mill, and if anybody bothers them shoot, and shoot to kill." (R., p. 124.) "Mill thugs and policemen, dirty devils, get them down and beat hell out of them. Shoot and shoot to kill." (R., p. 95.) "The mill thugs and stool pigeons have come down here to raise trouble, and we are not going to have it. I want the guards to arrest any one that they catch doing anything around here that they ought not to, and bring them to me, and what I will do won't be good for them." (R., p. 42.)
O. L. Glymph testified: "Beal said the time had come to form a picket line and go to the mill and drag them out. That they would never win the strike unless they shut the mill down. Said, if they had to fight they could fight, and if it took bloodshed they could shed it; that they had done that before."
Otto Mason testified: "McGinnis fired the first shot. He was about six feet from the south corner of the union building, facing the street *Page 288 
in front. To the best of my knowledge Beal is the man who hollered, `Shoot him!'" (R., p. 50.)
J. Robert Holly testified: "I heard Beal, in several speeches, refer to the police. He called them `tin-star deputies.' He said they didn't have any right to shoot and wouldn't shoot, and begged them to go ahead and from a picket line. . . . They kept the guns and ammunition in the inner office of the union hall. I don't know exactly how many guns they had there, but approximately seven or eight shotguns and I think, one pistol."
A. J. Roach testified that as he approached the front door of the union shall he recognized the defendant Beal as one of the men with a shotgun leveled at him.
Beal himself testified that he was inside the inner office of the union building when the shooting occurred; that he took Joe Harrison to the hospital — went from there to his rooming house — caught a taxi in the center of town and drove to Charlotte — spent the night in Charlotte and left next morning for Spartanburg, S.C., going by way of Pineville and Rock Hill, rather than drive through Gastonia — was arrested in Spartanburg and brought back to North Carolina.
W. M. McGINNIS.
It is in evidence that about three weeks prior to the shooting, the defendant McGinnis told Will Grady that he was one of the union guards, and is quoted as saying: "We have got plenty of guns and ammunition and men that knows how to use them, and the first damn officer that comes up there, that ain't got no business there, chances are he will be carried out."
On the night of the tragedy McGinnis was seen standing at the corner of the building with a shotgun pointed in the direction of the officers, and when they attempted to arrest Harrison, he hollered, "Turn him loose, turn him loose," jumped up off the ground two or three times and fired his gun in the direction of the officers. (R., p. 43.) This was the first shot fired. (R., p. 50.) It hit officer Gilbert. (R., p. 106.)
LOUIS McLAUGHLIN.
The first two shots came from the front of the building where McGinnis and McLaughlin were standing. The defendant McLaughlin told the sheriff of Cleveland County that he fired the second shot. Just fired in the bunch of officers. (R., p. 39.)
GEORGE CARTER.
After the shooting, the defendant Carter went into one of the tents, just back of the union hall, and got under a cot, taking his gun with *Page 289 
him, which he continued to try to use. As they pulled him out from under the cot, one of the officers remarked: "You shot the chief and you are fixing to shoot some of us," to which he replied: "The only reason I did not shoot you, I could not get my gun in position, or I would have done it." (R., p. 129.) He denied having shot the chief, but said: "I stopped him. I was the third man that shot. That is what I get $40 a week for."
JOSEPH HARRISON.
The State's evidence tends to show that the defendant Harrison was the guard who drew his gun on Gilbert as the officers came upon the union premises; and that he was present, armed with a shotgun, in furtherance of the unlawful conspiracy among the defendants. He heard the defendant Beal advise the strikers that they were a fighting union — not afraid of the police — had guards of their own who would take care of their property, etc. He was shot and found lying with the officers on the ground, close to Roach, after the encounter.
K. Y. HENDRICKS.
It is in evidence that when the officers came up, the defendant Hendricks was rather conspicuous, got up on an ice box and crowed like a rooster. (R., pp. 70 and 72.) After the shooting, he ran into a neighboring house and wanted to hide. There he is reported as saying: "We killed Chief Aderholt and Tom Gilbert, and I think Roach and one of our men is dying." He was described as being "scared to death — white as he could be." Speaking of his gun, he is alleged to have said: "I shot the damn thing out and throwed it to Vance Tramble and run." Hendricks was one of the guards stationed to protect the union headquarters and was present at one of the incendiary or inflammatory speeches made by the defendant Beal. (R., p. 75.)
CLARENCE MILLER.
The defendant Miller was guard manager of the tent colony. (R., p. 91.) Deputy Sheriff W. P. Upton arrived at the union hall within a few minutes after the shooting, saw Miller and asked him what the trouble was. He said, "If you will come inside I will try to explain it to you." Inside, the officer found five shotguns set at intervals of 6, 8 or 10 feet along the south side of the building, together with a lot of shells and cartridges. The shells were loaded with No. 4 shot, the size that hit the officers. When Miller was arrested, the officer asked him who did the shooting. He replied: "You know we have had the union *Page 290 
headquarters torn down by thugs and we are going to protect this one." He further said the officers came down there and he ordered them off the premises.
After laying the proper predicate therefor, several witnesses were permitted, over objections duly entered, to give in evidence dying declarations of the deceased to the effect: "I don't see why they shot me." . . . "I don't know why any one wanted to shoot me." . . . "I don't know why they shot me in the back. I never did them any harm." . . . "I don't know why they shot me in the back and killed me. I didn't do anything." Motions to strike; overruled; exceptions.
On cross-examination, and over objections duly entered, the defendant Beal was asked if he did not distribute to the strikers through the union headquarters, before and during the strike, a Communist newspaper, published in New York, known as The Daily Worker, which contained several communications critical of the mill owners and police officers of the city of Gastonia, to which he replied: "They were not distributed under my supervision. I just asked for them. I requested them to be sent there and then let anybody take them who wanted them. This was some time during the strike." (R., p. 234.) The witness had already testified, without objection, to a letter signed by him and published in said paper under date of 28 May, 1929.
On cross-examination and over objections duly entered, Mrs. Edith Saunders Miller, wife of the defendant, Clarence Miller, was required to read from a publication, the substance of which she admitted teaching the strikers' children, as follows:
1. "Wherever workers go on strike on what side do you find the Government? The answer came in the Southern strikes with very great speed. Immediately the State troopers were ordered out on strike duty. Immediately the National Guard were ordered out to shoot down and to bayonet men, women and children on the picket line. It is clear where the government stands. The government stands with the bosses against the strikers. The government stands for slavery for the workers, misery and starvation for the workers' children. The government stands for child labor. The government is the tool of the bosses against the workers."
2. "Strikers' children! We call upon you to join the `Young Pioneers,' an organization of workers' children all over the country. The Young Pioneers is that organization of the workers' children which fights for better conditions of the workers' children all the time; which fights against child labor; which fights against bosses' government; which fights for a workers' and farmers' government just like they have in Soviet Russia." *Page 291 
Again, for purposes of impeachment only, certain questions were propounded to this witness and answered, over objections duly entered, as follows:
"Q. Have you not taught in Gastonia that there is no God?
(No answer.)
"Q. Mrs. Miller, I ask you this question: `Do you believe in the existence of a Supreme Being who controls the destiny of men, who rewards their virtues or punishes their transgressions here or hereafter?'
"A. No. I believe that man controls his own destiny.
"Q. Therefore, taking an oath and appealing to this Supreme Being would have no effect on you?
"A. I say any oath I take to tell the truth has a binding effect on me.
"Q. When you take it on the Bible and appeal to God, would that have any effect on you?
"A. Yes, it is an oath. Any oath will have an effect on me.
"Q. You might take it on an almanac just as you would on a Bible and it would have the same effect on you, wouldn't it?
"A. Yes — I'd tell the truth."
Just prior to the foregoing part of the cross-examination, to which exceptions were duly taken and entered, the witness testified, without objection, as follows:
"I testified in the habeas corpus hearing and took an oath to tell the truth. Put my hand on the Bible for the purpose of testifying in this case. I have taken the oath. Put my hands on the Bible, swore to tell the truth, the whole truth, and nothing but the truth, so help me, God."
The defendants proposed to show by Plummer Stewart, a practicing attorney of the city of Charlotte, "that he knew the defendants' witness, S.W. McKnight, knew his reputation and it was good." Objection; sustained; exception.
The substance of the following excerpt from the court's charge to the jury forms the basis of several exceptive assignments of error:
"Certain of the defendants, to wit, Beal, Carter and Hendricks, went on the stand and testified in their own behalf and so the court instructs you that when you come to consider the evidence of these three defendants, the law requires that you shall remember their relation to the case as defendants, the interest which they have in the result of your verdict, and to scrutinize their testimony with care to the end that you may determine to what extent, if any, their testimony has been biased by their interest, . . . and having so considered it, you will give to their testimony such weight as you consider it is entitled to and if you believe them you should give their testimony the same weight as you would give the testimony of any other credible witness." *Page 292 
There was a motion in arrest of judgment upon the second, third and fourth courts, on the alleged ground that the defendants were not required to plead to the bills containing these charges; overruled; exception.
The defendants lodged a motion that the court set aside the verdict in its discretion for alleged prejudicial appeals of the solicitor in his closing argument to the jury; overruled; exception.
Verdicts: Guilty of murder in the second degree as to each of the defendants on the first count; guilty as charged as to each of the defendants on the second and third counts; and guilty of an assault with a deadly weapon as to each of the defendants on the fourth count.
Judgments: As to the defendants Beal, Carter, Harrison and Miller, and each of them, imprisonment in the State's prison for a term of not less than 17 nor more than 20 years on the charge of murder or the first count; 10 years on the second count — the two sentences to run concurrently — and prayer for judgment continued on the third and fourth counts. As to the defendants, McGinnis and McLaughlin, and each of them, imprisonment in the State's prison for a term of not less than 12 nor more than 15 years on the charge of murder or the first count; not less than 5 nor more than 7 years on the second count — the two sentences to run concurrently — and prayer for judgment continued on third and fourth counts. As to the defendant Hendricks, imprisonment in the State's prison for a term of not less than 5 nor more than 7 years on the charge of murder or the first count; 5 years on the second count — the two sentences to run concurrently — and prayer for judgment continued on the third and fourth counts.
The defendants appeal, assigning errors.
after stating the case: The one overshadowing circumstance, appearing on the record, which gives decided color and tone to the State's case, is that, when the shooting was over and the smoke of the guns had cleared away, it was discovered that three of the officers, and Roach who came with them, had been shot, one slightly hurt, two seriously injured, and the chief of police mortally wounded; while the defendants, with the exception of Joseph Harrison, were unharmed.
The case in brief, from the State's viewpoint, is simply this: Aderholt, Gilbert and Roach were shot down, being hit in the back, at least Aderholt was, while going with the guard under arrest from the front yard of the union premises to the city car. Ferguson, who was standing *Page 293 
a short distance in front of them and near the automobile, was also shot. The fact that the defendant Harrison was shot down at the same time and found lying with the officers would seem to indicate that he, and not George Carter who sustained no injuries, was the guard with the officers in the line of fire; leastwise the evidence clearly permits the inference, if it does not compel the conclusion.
Under these circumstances, the prosecution evidently contended with convincing logic that to accept the suggestion of the defendants that the injured officers were the victims of their own guns would be to reject all the natural evidence in the case and to substitute theory for fact. At any rate, the inculpatory circumstances, appearing on the record, are quite sufficient to carry the case to the jury as against each and all of the defendants. S. v. Allen, 197 N.C. 684, 150 S.E. 337.
The practice is now so firmly established as to admit of no questioning that, on a motion to nonsuit, the evidence is to be considered in its most favorable light for the prosecution. S. v. Rountree, 181 N.C. 535,106 S.E. 669. And further, the general rule is, that, if there be any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury; otherwise not, for short of this, the judge should direct a nonsuit or an acquittal in a criminal prosecution. S. v. Vinson, 63 N.C. 335. But if the evidence warrant a reasonable inference of the fact in issue, it is for the jury to say whether they are convinced beyond a reasonable doubt of such fact, the fact of guilt. S. v. McLeod,198 N.C. 649; S. v. Blackwelder, 182 N.C. 899, 109 S.E. 644.
Indeed, as to the defendant Beal, his immediate departure from the community was a circumstance worthy of consideration by the jury, especially in view of the fact that he was regarded as the guiding genius of the strike, and, as the State contends, had counseled violence. S. v.Mull, 196 N.C. 351, 145 S.E. 677; S. v. Lawrence, 196 N.C. 562,146 S.E. 395; S. v. Stewart, 189 N.C. 340, at p. 347, 127 S.E. 260; S. v.Malonee, 154 N.C. 200, 69 S.E. 786. And while the absence of the defendant Harrison from the witness stand, as a matter of law, created no presumption against him, and was not a proper subject for comment by counsel in arguing the case before the jury, nevertheless his failure to testify, of necessity, left the jury to infer the facts without the benefit of any statement from him. S. v. Tucker, 190 N.C. 708, 130 S.E. 720; S.v. Bynum, 175 N.C. 777, 95 S.E. 101.
That the defendants had conspired and unlawfully agreed among themselves to resist the officers to the death, and to shoot and shoot to kill, in case their plans were interrupted or their purposes frustrated, *Page 294 
as alleged and contended by the State, is a permissible inference from all the facts in the case. The evidence tends to show that instructions to this effect were given by Beal and executed by the defendants. S. v. Wrenn,198 N.C. 260, 151, S.E., 261.
Thus the State made out a prima facie case of conspiracy against the defendants, rendering the acts and declarations of each, done or uttered in furtherance of the common design, admissible in evidence against all, and the demurrers to the evidence were properly overruled. S. v. Ritter, ante, 116, S.C., 197 N.C. 113, 147 S.E. 733. "Every one who enters into a common purpose or design is equally deemed in law a party to every act which had before been done by the others, and a party to every act which may afterwards be done by any of the others, in furtherance of such common design." S. v. Jackson, 82 N.C. 565.
Moreover, it is a settled principle of law, apparently applicable to the facts of the instant case, that where a number of persons aid and abet each other in the commission of a crime, all being present, all are principals and equally guilty. S. v. Hart, 186 N.C. 582, 120 S.E. 345; S. v.Jarrell, 141 N.C. 722, 53 S.E. 127.
With respect to the demurrer interposed by the defendants to the bill of particulars filed by the solicitor, it is perhaps sufficient to say that, in this jurisdiction, a bill of particulars is not regarded as a part of the indictment. It may be amended at any time, with permission of the court, on such terms or under such conditions as are just, and is not subject to demurrer. S. v. Wadford, 194 N.C. 336, 139 S.E. 608. The office of a bill of particulars is to advise the court, and more particularly the accused, of the specific occurrences intended to be investigated on the trial, and to regulate the course of the evidence by limiting it to the matters and things stated therein. C. S., 4613; McDonaldv. People, 126 Ill. 150; 31 C. J., 752.
The demurrer to the bill on the grounds of duplicity and indefiniteness, was likewise properly overruled. S. v. Knotts, 168 N.C. 173,83 S.E. 972. C. S., 4623, provides against quashal for informality if the charge be plain, intelligible and explicit, and sufficient matter appear in the bill to enable the court to proceed to judgment. S. v.Haney, 19 N.C. 390. Besides, duplicity is ground only for a motion to quash, made in apt time, and is cured by verdict. S. v. Burnett,142 N.C. 577, 55 S.E. 72. By apt time, in this connection, is meant before plea, for after plea of not guilty is entered, a motion to quash is allowable only in the discretion of the court. S. v.Burnett, supra.
Nor were the defendants entitled to their discharge because of the order of mistrial, entered at the August Term as a matter of physical necessity,i. e., the insanity of one of the jurors. S. v. Tyson, 138 N.C. 627,50 S.E. 456. It is now the approved practice that in cases of necessity, *Page 295 
which are of two kinds, "physical necessity and the necessity of doing justice," a mistrial may be ordered in capital as well as other cases. S.v. Bell, 81 N.C. 591; S. v. Wiseman, 68 N.C. 203.
Even under the decisions in S. v. Garrigues, 2 N.C. 241, In re Spier,12 N.C. 491, and S. v. Ephraim, 19 N.C. 162, where the authority of the court to order a mistrial in capital cases, without the consent of the accused, was restricted to "urgent and overruling necessity," and denied as a discretionary right, the present order could readily be upheld. But the strictness of these earlier decisions has been greatly relaxed in a number of the more recent cases. S. v. Cain, 175 N.C. 825, 95 S.E. 930; S. v.Upton, 170 N.C. 769, 87 S.E. 328; S. v. Dry, 152 N.C. 813,67 S.E. 1000; S. v. Prince, 63 N.C. 529; 8 R. C. L., 153.
The law on the subject is stated in S. v. Tyson, supra, as follows: "It is well settled, and admits of no controversy, that in all cases, capital included, the court may discharge a jury and order a mistrial when it is necessary to attain the ends of justice. It is a matter resting in the sound discretion of the trial judge; but in capital cases he is required to find the facts fully and place them upon record, so that upon a plea of former jeopardy as in this case, the action of the court may be reviewed."
And in S. v. Cain, supra, the following was quoted from 8 R. C. L., 153, with approval: "Under the strict practice which anciently prevailed, in England at least, the discharge of the jury in a criminal case for any cause after the proceeding had advanced to such a stage that jeopardy had attached, but before a verdict of acquittal or conviction, was held to sustain a plea of former jeopardy, and therefore to operate practically as a discharge of the prisoner. In deference, however, to the necessities of justice, this strict rule has been greatly relaxed and the general modern rule is that the court may discharge a jury without working an acquittal of the defendant in any case where the ends of justice, under the circumstances, would otherwise be defeated."
The fact that one of the defendants, of his own volition, had temporarily absented himself from the court room when the order of mistrial was first entered, did not deprive the court of the power, on learning of the situation, to strike out the order of recess and repeat the proceedings in the presence of all the defendants, if such were necessary, which may be doubted, the dictum in S. v. Alman, 64 N.C. 364, to the contrary notwithstanding. To hold otherwise on the facts of the present record would be to "strain at a gnat, and swallow a camel." — Matt. 23:24. "The judge is not a mere moderator, and it would detract very much from the efficiency and economy of the administration of justice if he were hampered with arbitrary rules as to matters which have always been committed to his sound discretion." S. v. Southerland, 178 N.C. 676, 100 S.E. 187. *Page 296 
The order of mistrial in the instant case was fully justified, indeed rendered necessary, by the facts found by the court, fully set forth in the record, and the motion of the defendants for their discharge upon this ground was properly denied. S. v. Dry, supra.
It follows, therefore, as a necessary corollary, that, if the order of mistrial were properly entered, and we think it was, the defendants' subsequent plea of former jeopardy cannot be sustained. S. v. Tyson, supra;S. v. Scruggs, 115 N.C. 805, 20 S.E. 720; S. v. Carland, 90 N.C. 668;S. v. Washington, 90 N.C. 664. In capital cases as well as others, where, for sufficient cause found and set forth in the record, the judge discharges the jury before verdict, it is proper to hold the prisoner for another trial. S. v. Jefferson, 66 N.C. 309.
In passing, it may be added that if the defendants were not on trial for murder in the first degree at the August Term, which does not affirmatively appear from the record (our only source of judicial knowledge, Southerlandv. Crump, ante, 111), the discharge of the jury was a matter resting in the sound discretion of the court. S. v. Guthrie, 145 N.C. 492,59 S.E. 652. And it is further suggested, that, assuming the proceeding at the August Term was for the capital offense, the defendants have not again been put on trial for their lives. But we have considered these exceptions as debated on brief.
The defendants stressfully contend that the dying declarations of the deceased, O. F. Aderholt, as detailed by a number of witnesses, should have been excluded, because, it is said, they contain expressions of opinion, rather than statements of fact, and do not purport to identify the defendants as the persons who did the shooting. The State, on the other hand, says that to sustain these exceptions would be to sacrifice the principle under which dying declarations are received in evidence to a mere from of words.
It will be readily conceded that dying declarations which state only opinions or conclusions of the declarant are not admissible in evidence. S.v. Williams, 67 N.C. 12; S. v. Jefferson, 125 N.C. 712, 34 S.E. 648; Underhills Crim. Ev.3d 244.
Proper foundation or predicate was laid for the introduction of the dying declarations in question, and the ruling of the court in admitting them is fully sustained by what was said in S. v. Franklin, 192 N.C. 723,135 S.E. 859; S. v. Hall, 183 N.C. 806, 112 S.E. 431; S. v. Williams,168 N.C. 191, 83 S.E. 714; S. v. Bohanon, 142 N.C. 695,55 S.E. 797, and S. v. Mace, 118 N.C. 1244, 24 S.E. 798.
The general rule is, that, in prosecutions for homicide, declarations of the deceased, made while sane, when in extremis or in articulo mortis, and under the solemn conviction of approaching dissolution, concerning the killing or facts and circumstances which go to make up the res *Page 297 gestae of the act, are admissible in evidence, provided the deceased, if living and offered as a witness in the case, would be competent to testify to the matters contained in the declarations. S. v. Shelton, 47 N.C. 360;S. v. Williams, 67 N.C. 12; S. v. Mills, 91 N.C. 594; S. v. Behrman,114 N.C. 797, 19 S.E. 220; S. v. Jefferson, supra; S. v. Laughter,159 N.C. 488, 74 S.E. 913; Tatham v. Mfg. Co., 180 N.C. 627,105 S.E. 423; Williams v. R. R., 182 N.C. 267, 108 S.E. 915; Dellinger v.Building Co., 187 N.C. 845, 123 S.E. 78; Lockhart on Evidence, 148; 21 Cyc., 974; 1 R. C. L., 527.
We have a number of decisions to the effect that dying declarations are admissible in cases of homicide when they relate to the act of killing, or to the circumstance so immediately attendant thereon as to constitute a part of the res gestae, and appear to have been made by the victim in the present anticipation of death, which ensues. S. v. Laughter, supra. It is not always necessary that the deceased should express a belief in his impending demise; it is sufficient if the circumstances and surroundings in which he is placed indicate that he is fully under the influence of the solemnity of such a belief, and so near the point of death as to "lose the use of all deceit" — in Shakespeare's phrase. S. v. Bagley, 158 N.C. 608,73 S.E. 995. In S. v. Tilghman, 33 N.C. 513, the Court said: "It is not necessary that the person should be in articulo mortis (the very act of dying); it is sufficient if he be under the apprehension of impending dissolution, when all motive for concealment or falsehood is presumed to be absent, and the party is in a position as solemn as if any oath had been administered."
It is the uniform holding, here and elsewhere, that dying declarations, otherwise admissible, are not rendered incompetent by reason of the fact that they contain statements tending to show provocation, or the want of it, on the part of the accused, when such utterances relate immediately to the act of killing, for then they are regarded as "short-hand statements of fact." Marshall v. Telephone Co., 181 N.C. 292, 106 S.E. 818; S. v.Mace, supra; S. v. Crean, 43 Mont. 47, Ann. Cas., 1912C, 424, and note. Touching this point, the following from Chamberlayne on Evidence was quoted with approval in S. v. Williams, 168 N.C. 191, 83 S.E. 714:
"A sufficient administrative necessity for accepting an inference or conclusion in a dying declaration is furnished where a large number of minute phenomena, often so intangible and interblending as to forbid effective individual statement, are given by the declarant in the form of a `collective fact,' often the only way in which a speaker can well express himself. Thus, a declarant may properly state that a given shooting was an `accident' or that he had been `butchered' by the malpractice of a doctor, and so forth. Even where a considerable element of voluntary *Page 298 
or intentional reasoning is present, the declaration may simply amount to the statement of a fact in a vigorous and striking way, summarizing a number of facts in a single vivid expression, e. g., `He shot me down like a dog.'"
Nor was it error in the instant case for the trial court to overrule the defendants' objections to the dying declarations of the deceased on the alleged ground that they did not purport to identify the defendants as the persons who did the killing. The statements of the deceased, in detailing the facts attending the infliction of his fatal wounds, were evidently intended to relate to those who were present with guns, shooting, and the conclusion is permissible that his references were to the defendants or to those on trial. S. v. Arnold, 35 N.C. 184. But even if this were doubtful, such doubt on the facts of the present record would only affect the weight, and not the competency, of the declarations. S. v. Watkins,159 N.C. 480, 75 S.E. 22.
The cross-examination of the defendant Beal with respect to the distribution among the strikers of a Communist newspaper, known as TheDaily Worker, was competent as tending to show the purposes and objects which the members of the union had in mind, and the methods by which they proposed to accomplish those objects. It is a permissible inference that, as these publications containing criticisms of the police officers of the city of Gastonia, were distributed through the union headquarters, the members of the organization thereby intended to make such criticisms their criticisms, and any suggestions contained therein, their suggestions and advice. Spies v. People, 122 Ill. 1, 3 Am. St. Rep., 322, at p. 444; S.c., 123 U.S. 131.
Furthermore, it is an unquestioned truism that the cross-examination of a witness may be pursued by counsel as a matter of right so long as it relates to facts in issue or relevant facts which were the subject of his examination-in-chief. Milling Co. v. Highway Com., 190 N.C. 692,130 S.E. 724. When, however, it is sought to go beyond the scope of the examination-in-chief, for purposes of determining the interest or bias of the witness and to impeach his credibility, the method and duration of the cross-examination for these purposes rest largely in the discretion of the trial court. S. v. Patterson, 24 N.C. 346; Wigmore on Evidence (2d ed.), sec. 944 et seq.; 28 R. C. L., 445. In S. v. Davidson, 67 N.C. 119, it was said that the tendency of modern decisions is to allow almost any question to be put to a witness, and to require him to answer it, unless it should subject him to a criminal prosecution. This was approved in S. v.Lawhorn, 88 N.C. 634, and S. v. Robertson, 166 N.C. 356, 81 S.E. 689. But in S. v. Winder, 183 N.C. 776, 111 S.E. 530, it was suggested that the rule, thus broadly stated, was subject to some exceptions, and called attention to *Page 299 
the opinion in S. v. Holly, 155 N.C. 485, 71 S.E. 450, and what was said therein as to collateral testimony on the question of character.
The strike, it should be remembered, was being conducted by the National Textile Workers Union, of which the defendant Beal was an officer and representative. The evidence tends to show that he was in reality the leader of the strikers and their chief counsellor. Hence, it was competent to cross-examine him as to the part he took in the distribution of the publications in question. Spies v. People, supra.
What has been said with respect to the cross-examination of the defendant Beal, concerning the distribution of copies of The Daily Worker, applies equally to the cross-examination of Mrs. Edith Saunders Miller, wife of Clarence Miller, relative to the substance of what she taught the strikers' children. Mrs. Miller was organizer of the children's section of the union and had been asked by the national office, in fact by the president of the union, to come to Gastonia and help organize the workers in the textile industry, which she was then engaged in doing. Note to Spiesv. People, 3 Am. St. Rep., 473.
It is charged that the defendants had conspired and unlawfully agreed among themselves to resist the officers of the law, representatives of the government, and it was, therefore, competent to ascertain what part, if any, they took in exciting resistance to the officers and discontent with the government. King v. Hunt, 3 Barn. Ald., 566. The questions propounded in this respect were not improper. Commonwealth v. Sacco, 255 Mass. 369, at p. 439.
We now come to the exceptions upon which the defendants place great reliance for a reversal of the judgments, to wit, those taken during the cross-examination of Mrs. Miller with respect to her religious views.
The question sought to be presented by these exceptions is whether the witness, whose competency as such is not assailed, and who is not a party, can be interrogated, on cross-examination, as to her religious belief or unbelief, for the purpose of discovering her credibility.
The right so to interrogate a witness has been affirmed in some jurisdictions and denied in others, depending upon the constitutional and statutory provisions in the respective states at the time. S. v.Washington, 49 La. Ann. Cas., 1602; 42 L.R.A., 553, and note; Clinton v.State, 53 Fla. 98, 12 Ann. Cas., 151, and note; 40 Cyc., 2613.
It was provided by section 19 of the Declaration of Rights, Constitution of North Carolina of 1776, "That all men have a natural and unalienable right to worship Almighty God according to the dictates of their own conscience." This was amended with the adoption of the Constitution of 1868, so as to read as follows: "Sec. 26. Religious liberty. All men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, and *Page 300 
no human authority should, in any case whatever, control or interfere with the rights of conscience."
We are not now called upon to say, nor do we decide, what effect, if any, this change in the organic law had upon the then existing disqualification of witnesses, or upon the right of the Legislature thereafter to render persons incompetent to testify as witnesses, on account of their opinions on matters of religious belief. Nor do we find any case, heretofore decided, dealing with the effect of this change. S. v.Pitt, 166 N.C. 268, 80 S.E. 1060; Lanier v. Bryan, 184 N.C. 235,114 S.E. 6.
The point stressed on the argument and debated on brief is not what questions may be put to a person on his voir dire to test his competency to be sworn as a witness, but whether a witness, whose competency is not challenged and who is not a party, may be interrogated, on cross-examination, concerning his opinions on matters of religious belief, for the purpose of affecting his credibility.
Under sections 3189, 3190 and 3191 of the Consolidated Statutes witnesses are required to be sworn or affirmed to speak the truth before they are allowed to testify, but we have no statute dealing with the exact question under review. See valuable article by Hon. J. Crawford Biggs in North Carolina Law Review, December, 1929, entitled, "Religious Belief as Qualification of a Witness." And further, as bearing on the policy of the State, it may be observed that "all persons who shall deny the being of Almighty God" are disqualified for office under Article VI, sec. 8, of the Constitution. Ours is a religious people. This is historically true. American life everywhere, as expressed by its laws, its business, its customs, its society, gives abundant recognition and proof of the fact.Church of the Holy Trinity v. United States, 143 U.S. 457.
Competency and credibility are two different things. A person may be a competent witness and yet not a credible one. The law declares his competency, but it cannot make him credible. "The credibility of a witness is a matter peculiarly for the jury, and depends not only upon his desire to tell the truth, but also, and sometimes even to a greater extent, upon his insensible bias, his intelligence, his means of knowledge and powers of observation." Cogdell v. R. R., 129 N.C. 398, 40 S.E. 202.
Cross-examination is one of the principal tests which the law has devised for the discovery of truth. By means of it, the situation of the witness with respect to the parties, and to the subject of litigation, his interest, his motives, his inclination and prejudices, his means of obtaining a correct and certain knowledge of the facts to which he bears witness, the manner in which he has used those means, his powers of discernment, *Page 301 
memory, etc., may all be fully investigated in the presence of the jury, to the end that an opportunity may be afforded for observing his demeanor and determining the weight and value which his testimony merits. Milling Co. v.Highway Commission, supra. Ordinarily, therefore, a witness may be asked any questions on a cross-examination which tend to test his accuracy, to show his interest or bias, or to impeach his credibility. Gr. Ev. (16th ed.), sec. 446.
This much is conceded, but it is contended that a personal scrutiny into one's faith and conscience, or defect of religious sentiment and belief according to the prevailing opinion of the community at the time, has no proper bearing on the question as to whether he condemns falsehood or holds truth as a virtue, and is therefore contrary to the spirit of American institutions. Brink v. Stratton, 176 N.Y. 150, 63 L.R.A., 182; Bush v.Commonwealth, 80 Ky. 244; Free v. Buckingham, 59 N.H. 219; Perry v.Commonwealth, 3 Gratt. (Va.), 632.
The following statement appears in 30 A. E. Enc. of Law, 1096: "Laws providing that no person shall be incompetent to testify on account of religious belief, that no control of or interference with rights of conscience shall be permitted, or the like, have been held not only to make persons competent to testify without regard to religious belief or unbelief, but also to prevent any inquiry into that belief for the purpose of affecting credibility." People v. Copsey, 71 Cal. 548; Starks v.Schlensky, 128 Ill. App. 1; Dickinson v. Beal, 10 Kan. App. 233; Peoplev. Jenness, 5 Mich. 305; White v. Com., 96 Ky. 180; Louisville, etc., R.Co. v. Mayes, 26 Ky. 187.
But is it an interference with the rights of conscience, or an effort to control such rights (prohibited by our Constitution), to interrogate a witness about his opinions on matters of religious belief? It is not proposed to change his opinions or to disturb them in any way. It is only sought to discover what opinions he entertains — those of his own choosing — so as to enable the jury, as far as such indications will allow, to know what manner of thoughts he is thinking at the time he testifies. It has been said that a man is what he thinks, "For as he thinketh in his heart, so is he." Prov. 23:7.
It has been held, in a number of States, where persons are excluded as witnesses for defect of religious sentiment and belief, that if the ordinary oath is administered to a witness, without his making any objection to its form, he may be asked, on cross-examination, whether he thinks the oath binding on his conscience. I Gr. Ev., sec. 371. See, also,Stanbro v. Hopkins, 28 Barb. (N. Y.), 265.
And in Carver v. U.S., 164, U.S., 694, speaking of dying declarations and their impeachment, the Court said: "They may be contradicted in the same manner as other testimony, and may be discredited *Page 302 
by proof that the character of the deceased was bad, or that he did not believe in a future state of rewards or punishments," citing a number of cases as authority for the position. To like effect is the decision inCambrell v. State, 92 Miss. 728, 31 Am. St. Rep., 549, 17 L.R.A. (N.S.), 291.
It is not an interference with the constitutional rights and liberties of a witness to require him to disclose, on cross-examination, his present situation, employment and associates; as for example, in what locality he resides, what occupation he pursues, and whether or not he is intimately acquainted and conversant with certain persons; for, however these may disparage him in the eyes of the jury, they are of his own selection, and constitute proper matters of inquiry; subject, of course, to the rule against self-incrimination. Gr. Ev., sec. 456; S. v. Simpson, 9 N.C. 580; Note, 75 Am. St. Rep., 318; 28 R. C. L., 423.
On the other hand, it may be queried that, if one's religious belief or unbelief is not to affect his competency as a witness, but may be inquired of to affect his credibility, have not his rights of conscience, for all practical purposes, been affirmed and denied in the same breath? What boots it, ask the advocates of this view, whether he be refused the right to testify altogether, or being permitted to testify, have his testimony discredited and rejected by the jury, if, in the end, they both amount to the same thing? In this connection, it is contended that there is no essential difference between a refusal to hear and a rejection after hearing. Brink v. Stratton, supra; Bush v. Commonwealth, supra; Perry v.Commonwealth, supra. By statute in Indians, and perhaps in other States, it is provided that want of religious faith shall not affect the competency of a witness, but shall go only to his credibility. Snyder v. Nations, 5 Blackf., 295.
There are those who feel more deeply over religious matters than they do about secular things. It would be almost unbelievable, if history did not record the tragic fact, that men have gone to war and cut each other's throats because they could not agree as to what was to become of them after their throats were cut. Many sins have been committed in the name of religion. Alas! the spirit of proscription is never kind. It is the unhappy quality of religious disputes that they are always bitter. For some reason, too deep to fathom, men contend more furiously over the road to heaven, which they cannot see, than over their visible walks on earth; and it is with these visible walks on earth alone that we are concerned in the trial of causes. In recognition of this fact and because "our civil rights have no dependence on our religious opinions," as proclaimed by Thomas Jefferson and embodied in the Virginia statute of religious freedom, it was provided in the North *Page 303 
Carolina Constitution of 1868, that "no human authority should, in any case whatever, control or interfere with the rights of conscience."
Cogent reasons may be advanced on both sides of the question, and were advanced on the argument in this case. But we do not think the record calls for an interpretation of the constitutional provision, above set out, or for a definite ruling on the question debated. The answers of the witness, taken in connection with her previous testimony, do not show that she intended to express disbelief in a Supreme Being, or to deny all religious sense of accountability, such as would have disqualified her as a witness at the common law, or under the Declaration of Rights of 1776. Shaw v.Moore, 49 N.C. 25; Note, 12 Ann. Cas., 155. But even if error were committed in not sustaining objections to the questions propounded, which is not conceded, it would seem that, in the light of the answers elicited, no appreciable harm has come to the defendants, if harm at all, and that the verdicts and judgments ought not to be disturbed on account of these exceptions.
Mere error in the trial of a cause is not sufficient ground for a reversal of the judgment. To accomplish this result, it should be made to appear that the ruling was material and prejudicial to appellant's rights.S. v. Heavener, 168 N.C. 156, 83 S.E. 732; S. v. Smith, 164 N.C. 475,79 S.E. 979; Cotton Mill v. Hosiery Mills, 181 N.C. 33, 106 S.E. 24. The foundation for the application of a new trial is the allegation of injustice arising from error, but for which a different result would likely have ensued, and the motion is for relief upon this ground. Unless, therefore, some wrong has been suffered, there is nothing to relieve against. The injury must be positive and tangible, and not merely theoretical. In re Ross, 182 N.C. 477, 109 S.E. 365; Brewer v. Ring andValk, 177 N.C. 476, 99 S.E. 358.
The exception with respect to what the defendants proposed to show by Plummer Stewart, offered as a sustaining character witness to a character witness, is not properly presented. It is not stated that the witness, if allowed to testify, would have qualified and given evidence as suggested.S. v. Steen, 185 N.C. 768, 117 S.E. 793. The exception is not sustained.
The instruction of the court that the testimony of the defendants who went upon the stand and testified in their own behalf, should be scrutinized with care to ascertain to what extent, if any, their testimony was warped or biased by their interest, adding, however, that if, after such scrutiny, they believe the defendants, they should give the same credit to their testimony as if they were disinterested, is supported by what was said in S. v. Ray, 195 N.C. 619, 143 S.E. 143; S. v. Green,187 N.C. 466, 122 S.E. 178; S. v. Lance, 166 N.C. 411,81 S.E. 1092; S. v. Fogleman, 164 N.C. 458, 79 S.E. 879; S. v. Graham, *Page 304 133 N.C. 645, 45 S.E. 514; S. v. Lee, 121 N.C. 544, 28 S.E. 552; S. v.Byers, 100 N.C. 512, 6 S.E. 420. The exceptions to this instruction are not well founded.
The motion in arrest of the judgments on the second, third and fourth counts, for that, it is alleged, the defendants were not required to plead to the bills containing these charges, was properly overruled. S. v.Mitchem, 188 N.C. 608, 125 S.E. 190; Note, 13 L.R.A. (N.S.), 811.
In the first place, no objection seems to have been entered by the defendants to the motion of the solicitor that the four bills be consolidated and tried as different counts in a single indictment. S. v.Lewis, 185 N.C. 640, 116 S.E. 259. The defendants had already entered a plea of not guilty to the principal bill charging murder, and it may well be said that this plea applied to any and all counts, subsequently added thereto without objection, which related to the same transaction. S. v.Malpass, 189 N.C. 349, 127 S.E. 248; S. v. McNeill, 93 N.C. 552. But if it were otherwise, and the principle announced in S. v. Cunningham,94 N.C. 824, that an issue raised by plea is essential to a valid verdict, should be held to be applicable, still this could avail the defendants but little on the present record, because they were specifically convicted on the first count, which is not challenged by the motion in arrest. S. v.Toole, 106 N.C. 736, 11 S.E. 168.
Furthermore, the sentences on all the counts, as to each and all of the defendants, are made to run concurrently, and, in each instance, the judgment on the first count is longer than the sum of the judgments on the other counts. So, even if error were committed with respect to these lesser counts, it would not affect the verdict and judgment on the first count. S.v. Coleman, 178 N.C. 757, 101 S.E. 261; S. v. Jarrett, 189 N.C. 516,127 S.E. 590.
The motion to set aside the verdicts and for a new trial on the ground of alleged prejudicial appeals by the solicitor in his closing argument to the jury is, in its very terms, addressed to the discretion of the court, and there is nothing on the record to show any abuse of discretion or that the solicitor exceeded the limits of fair debate. S. v. Phifer,197 N.C. 729, 150 S.E. 353; S. v. Green, ibid., 624,150 S.E. 18; S. v. Tucker, 190 N.C. 708, 130 S.E. 720.
The general rule is, that what constitutes legitimate argument in a given case is to be left largely to the sound discretion of the trial court, which will not be reviewed on appeal unless the impropriety of counsel be gross and well calculated to prejudice the jury. Lamborn v.Hollingsworth, 195 N.C. 350, 142 S.E. 19; Jenkins v. Ore Co., 65 N.C. 563.
Speaking to the subject in S. v. Tyson, 133 N.C. 692, 45 S.E. 838,Walker, J., delivering the opinion of the Court, said: "We conclude, therefore, that the conduct of a trial in the court below, including *Page 305 
the argument of counsel, must be left largely to the control and direction of the presiding judge, who, to be sure, should be careful to see that nothing is said or done which would be calculated unduly to prejudice any party in the prosecution or defense of his case, and when counsel grossly abuse their privilege at any time in the course of the trial the presiding judge should interfere at once, when objection is made, at the time, and correct the abuse. If no objection is made, while it is still proper for the judge to interfere in order to preserve the due and orderly administration of justice and to prevent prejudice and to secure a fair and impartial trial of the facts, it is not his duty to do so in the sense that his failure to act at the time or to caution the jury in his charge will entitle the party who alleges that he has been injured to a new trial. Before that result can follow the judge's inaction, objection must be entered at least before verdict."
This was further amplified in S. v. Davenport, 156 N.C. 596,72 S.E. 7, as follows: "In the passage taken from S. v. Tyson, we did not intend to decide that a failure of the judge to act immediately would be ground for a reversal, unless the abuse of privilege is so great as to call for immediate action, but merely that it must be left to the sound discretion of the court as to when is the proper time to interfere; but he must correct the abuse at some time, if requested to do so; and it is better that he do so even without a request, for he is not a mere moderator, the chairman of a meeting, but the judge appointed by the law to so control the trial and direct the course of justice that no harm can come to either party, save in the judgment of the law, founded upon the facts, and not in the least upon passion or prejudice. Counsel should be properly curbed, if necessary, to accomplish this result, the end and purpose of all law being to do justice. Every defendant `should be made to feel that the prosecuting officer is not his enemy,' but that he is being treated fairly and justly. S. v. Smith, 125 N.C. 618."
In the instant case, it appears that the court promptly stopped the solicitor on objection being made to his argument by counsel for the defendants, and at one time the court of its own motion directed the solicitor to stay within the record, but there is nothing to show the character of the argument or that the judge failed to do his full duty in this respect.
There are numerous other exceptions in the case, all of which have been examined with care. Even if there be technical error in some of the rulings, this alone would not work a new trial. We are convinced, from a searching scrutiny of all that transpired on the hearing, to which exceptions have been taken, that substantial justice has been done, and that no reversible error has been made to appear. The verdicts and judgments, therefore, will be upheld.
No error. *Page 306